John KOUFAKIS, Plaintiff-Appellee,

v.

Thomas CARVEL and Franchise Licensors, Inc., Defendants-Appellants.

Nos. 182 and 183, Dockets 33732 and 33827.

United States Court of Appeals, Second Circuit.

Argued Oct. 29, 1969.

Decided April 24, 1970.

George D. Marlow, Kew Gardens, N. Y. (Morris Marlow, Corona, N. Y., on the brief), for plaintiff-appellee.

Nicholas M. Pette, Jamaica, N. Y., (Leonard Toboroff, Yonkers, N. Y., and Joseph P. Napoli, Bayside, N. Y., on the brief), for defendants-appellants.

Before LUMBARD, Chief Judge, and MEDINA and FEINBERG, Circuit Judges.

LUMBARD, Chief Judge:

The appellants Thomas Carvel and Franchise Licensors, Inc. appeal from a judgment against Franchise Licensors[1] for $126,000 awarded, after a jury trial in the Eastern District of New York, to the appellee John Koufakis for breach of his franchise contract to operate Carvel Store Number 184 in Queens Village as an ice cream dealer. The jury by special verdict found that the appellants committed a substantial breach of the contract by improperly terminating it, and awarded $187,500 in compensatory damages; it also found that no punitive damages should be awarded. The trial judge granted a motion for a new trial which was based in part on the improper and prejudicial arguments of plaintiff's trial counsel, unless the plaintiff agreed to a remittitur of $61,500. Although both parties appealed, the appellee is now content with a verdict for $126,000. We reverse and order a new trial because of the numerous grossly prejudicial arguments made by plaintiff's counsel in summation and during trial, against which the trial judge's comments and charge gave little or no protection. As there must be a new trial, we also consider whether the question of punitive damages should have been submitted to the jury and whether the jury should have been allowed to evaluate the likelihood that the franchise would have been renewed after it expired.

## I. THE FACTS

A summary of the record shows that there was sufficient evidence to leave to the jury the question whether the appellants had improperly terminated Koufakis' franchise contract.

On June 2, 1958, John Koufakis and Carvel Stores of New York, Inc.,[2] entered into a Dealer's Franchise Agreement whereby Koufakis was to run Carvel Store Number 184 until July 31, 1968, a period of ten years. The preamble to this agreement, which emphasized the importance of maintaining the high quality standards of Carvel products, stated:

"This Frozen Dairy Product is made in accordance with a Carvel formula, consisting of high quality ingredients and is sold in fine sanitary stores, which are created in accordance with patented designs and specifications. The public has been accustomed to seek Carvel Frozen Dairy Products at these unique Carvel Stores * * *, and to purchase therefrom Carvel's Frozen Dairy Products manufactured in accordance with the Carvel formula and none other. The Dealer desires to operate a Carvel Store and Carvel is willing and agrees that the Dealer operate a Carvel Store in accordance with the terms of this agreement."

A "Standard Operating Procedure Manual" was expressly incorporated as "an integral part" of the franchise agreement, which provided that the store was to be "maintained and operated in accordance with the specific provisions of the Manual." The agreement further provided that:

"During the term of this agreement, the Dealer agrees to sell at the Carvel Store, Carvel's Frozen Dairy Products solely in accordance with the Manual and will sell no other product except as hereinafter expressly otherwise provided. If at any time the Dealer fails to maintain and operate a Carvel Store in accordance with the defini-

1. The judgment further provides "that the action against defendant, Thomas Carvel be dismissed on the merits, provided however, that in the event this judgment is reversed on appeal and a new trial is ordered as to defendant Franchise Licensors, Inc., plaintiff shall be entitled to reinstate the action against * * *

Thomas Carvel with the same force and effect as though this judgment had not been entered * * *." We assume that upon retrial this portion of the judgment will have its intended effect.

2. Franchise Licensors, Inc. was the successor franchisor to Carvel Stores of New York, Inc., as of 1963.

tion contained in the agreement and in the Manual, then the Dealer's failure to do so shall be deemed to be a breach of a vital term of this agreement and shall entitle Carvel, upon giving written notice to the Dealer, to terminate this agreement."

Carvel was also given the right to inspect the store "at any and all times desired by Carvel." Koufakis was obligated "promptly [to] correct any errors or omissions found by [Carvel] inspectors and officers." As regards the procedure for termination, the agreement stated:

"In the event that the Dealer should breach any of the terms of this agreement, or default in the performance of any of the obligations under the Manual, * * * and should such breach not be remedied to the satisfaction of Carvel within forty-eight (48) hours or such later time as Carvel may specify in a written notice to that effect mailed to the Dealer and then this agreement shall terminate fully and in all respects, and the Dealer shall then have no further rights hereunder."

As to renewal of the franchise, the agreement specified a ten-year initial term and, in the following paragraph, recited that "This agreement shall be automatically renewed for an additional period of —0— years. * * * *"

There was testimony that Koufakis was on the "C.O.D. list" throughout the period of his dealership—that is, that he was to pay cash for all supplies delivered to him. Inspections of Koufakis' store did take place, and minor defects in operation were called to his attention. In June 1962, Carvel inspectors discovered non-Carvel ices stored in his freezer. Koufakis' explanation was that these ices were being stored there for a short time before being served at an outing for a Little League team which he sponsored and that they were not there for sale to the public. Carvel's attorneys apparently accepted this expla-

nation, but they did make it clear to Koufakis that the presence of non-Carvel items in the store was a serious matter; in fact, they had Koufakis sign a $5000 confession of judgment to apply to future instances of such behavior.

Koufakis called as a witness Salvatore Russo, who was credit manager and later head of the accounting department for the Carvel organization until his voluntary departure on April 2, 1963. Russo testified that Koufakis was considered a slow-paying account, an "irritant," and a nonconformist by the officials at the central offices of Carvel. Regarding such nonconforming dealers as a group, Russo further stated that he attended a staff meeting of Carvel officers in March 1963, at which time Thomas Carvel remarked "Look, we are going to get a corporation set up, and put all these guys into that corporation. Eventually we will work them out of the Carvel system."

The evidence showed that Koufakis, under subpoena, had testified on November 5, 1963 (after the above-described staff meeting), before a trial examiner of the Federal Trade Commission, which was then conducting an inquiry into Carvel's franchising practices.[3] One of Koufakis' contentions was that this testimony so angered Thomas Carvel and others in the organization that they determined to get rid of him.

On August 24, 1965, Koufakis was notified that an inspection of his store had revealed some operational deficiencies and he was given 48 hours' notice to correct them; Koufakis apparently corrected the defects and sent a letter to Carvel on September 1, 1965, stating that he had taken corrective action and thanking Carvel for the inspections which assisted him to "judge my help."

On July 17, 1966, Martin Mannino, a Carvel field representative, inspected Store Number 184. He took samples of the various products and product compo-

---

3. See Franchised Stores of New York, Inc. v. Winter, 394 F.2d 664, 666 (2d Cir. 1968); Matter of Carvel Corp., CCH Trade Reg.Rep., Transfer Binder ¶ 17,298 (1965).

nents on the premises; these samples were stored by him in an ice chest in the trunk of his car during that day, and in his home freezer overnight. They were delivered the following day to St. Lawrence Dairy Testing Laboratory, an independent testing firm which regularly made tests for Carvel. Mannino testified that he bought other samples of take-home products—primarily pre-packaged pints of various flavors of ice cream stored in three display freezers—during "a period of ten days, [or] two weeks" thereafter. The St. Lawrence laboratory reports introduced in evidence by Carvel indicate that such samples were taken July 15, 16, 22, 23, 24, 25, 26, 27, 28, 29, 30, and 31, 1966. On July 30, July 31, and August 1, 1966, samples were apparently taken from Koufakis' freezers from which ice cream cones were dispensed. All of these samples were also delivered to St. Lawrence, although there was no testimony concerning the conditions under which they were transported from the store to the lab. As to the samples taken on July 17, Mannino testified that he left duplicate samples, in sterile jars, at Store Number 184 for Koufakis. The laboratory reports on this two-week series of samples showed some degree of dilution, contamination, or both, of some or all of the various products tested. It was Koufakis' claim that the samples were improperly taken and kept, that the tests were not properly made and reported, and that Carvel falsified the test results.

Carvel sent a letter to Koufakis on July 21, 1966, stating that the company was concerned about the results of the tests which had been completed and reported as of that date. Carvel again gave Koufakis 48 hours' notice to correct the conditions or face termination. Koufakis testified that after receiving this letter and before he received the two telegrams effecting termination as of August 1, 1966, he called Leonard Toboroff, an attorney for Carvel who had signed the July 21 letter, to find out more precisely the nature of the contamination and dilution which the tests showed.[4] Toboroff gave no specific answer, but told Koufakis that he would check further and suggested calling back the next day. Koufakis did so, and still received no specific answers as to the locus of the problem. Then Koufakis

4. The July 21 letter provided no such information. It stated, in pertinent part:
"Dear Mr. Koufakis:

Acting upon information earlier learned, controlled purchases at Store #184 have demonstrated that the products being sold from the Store are substantially diluted in violation of the Agricultural Markets law of the State of New York and the franchise and Standard Operating Procedure Manual requirements of Carvel. Even if the products were made from mix other than Carvel Special Formula Mix, so great a dilution is present as to violate the State Law with respect to the minimum content of any products sold as 'ice cream.'

This matter is extremely serious and jeopardizes the investment of each and every Carvel Dealer in the Chain. In addition to the grave risks attendant upon the tampering with any food product sold to the public for consumption, it is also a breach of the franchise agreement which if not cured as provided for, is grounds for termination of your franchise.

Accordingly, this letter is sent as notice of forty-eight (48) hours under Paragraph 'Seventeenth' of your franchise agreement within which to remedy this situation to our satisfaction. In the event this dilution is not immediately stopped and all diluted products removed from the Store and destroyed, we shall have no other alternative than to thereafter terminate your franchise agreement and assert all claims for damages resulting from your wrongful acts."

The July 29, 1966, telegram which Koufakis received was slightly more specific. It refers to "dilution and contamination which is shown by laboratory analysis to have continued to date in the freezer fresh products, novelties and take home items being manufactured and sold at [store] #184."

The August 2, 1966, telegram refers to disregard of "past repeated notices" by Koufakis, and effects termination of the franchise.

called Jacob Goodman, who, according to Koufakis, was "the one who sent those [termination] telegrams, maybe both." Koufakis stated that Goodman

> "gave me the same story. And the next day we were terminated. So * * * we never found out why he terminated the contract, he never let us know * * *."

Sometime at the end of July, Koufakis had the duplicate samples left by Mannino during his July 17th inspection picked up by Bernard Tzall, who worked at an independent laboratory known as Certified Laboratories, Inc. Tzall testified that he took ten samples in all from Koufakis' store: five which he was told had been taken by the Carvel inspector (Mannino's duplicates), and five others that Tzall took while there. Tzall stated that he ran no tests for dilution on these ten samples; he did, however, test them for contamination and found that two samples contained some bacterial contamination in excess of limits set by City of New York health regulations. On August 4, 1966, after termination, Tzall returned to the store to pick up four more samples—duplicates of those taken by a Carvel inspector on August 1. At this time, Tzall also took a sample from an open can of white mix in the freezer of Store Number 184. As to these five samples, he testified that his tests showed that there was no improper dilution or contamination.[5]

Meanwhile, on July 29, 1966, Koufakis received a telegram again requesting that he stop diluting and contaminating Carvel's products. Thereafter John W. Stewart, general manager of the Carvel Corporation, made the decision to terminate Koufakis' franchise and on August 2, Franchise Licensors sent a telegram to Koufakis terminating his dealership.

## II. EXISTENCE OF FEDERAL JURISDICTION: LITIGATION IN STATE AND FEDERAL COURTS BETWEEN THE PARTIES

At oral argument, we questioned counsel about the existence of federal jurisdiction, since the case was presented to us in the briefs as essentially a breach of contract action by Koufakis against Thomas Carvel and Franchise Licensors, all of them residents of New York.

Although the matter is not entirely free from doubt, we think the district court had jurisdiction of the issues raised by the pleadings in the two suits which were consolidated for trial.

The complaint filed in the Eastern District by Franchise Licensors on August 3, 1966, raised the issue of trademark infringement. It charged that, despite termination of his franchise, Koufakis was "continuing to represent himself as a Carvel Dealer and * * * attempting to palm off non-Carvel products from Carvel Store #184" and that such conduct constituted "infringement of the Carvel trademarks registered in the United States Patent Office in violation of 15 U.S.C.A. 1125." Because of these allegations, and because of other alleged breaches of the franchise agreement which Franchise Licensors claimed were also infringement of the Carvel trademarks,[6] Franchise Licensors sought money damages and injunctive relief.

Koufakis' answer, filed on September 9, 1966, contained a broad counterclaim alleging that the "Carvel complex" had wrongfully terminated the franchise pursuant to a fraudulent and malicious

5. Tzall also testified about the results of some tests he had run on ice cream products purchased by Koufakis, after his franchise was terminated, at another store run by the Carvel organization, but Judge Weinstein restricted such testimony and instructed the jury that it was entitled to little weight. In this we feel he was correct.

6. The Franchise Licensors' complaint also charged, inter alia, that dilution and contamination of the products constituted a breach of the franchise contract, and sought money damages therefor. In requesting injunctive relief, the complaint also pointed out the provision of the franchise contract which states that a breach by one dealer can cause irreparable injury to the other dealers.

conspiracy designed to drum Koufakis out of the organization and that such actions "violated all of the terms and provisions of the contract between the parties." The counterclaim also alleged that agents and employees of Carvel had engaged in this course of conduct "with deliberate malice and intent to injure [Koufakis] in his business, good name, character, fame and reputation," and that Koufakis was in fact so injured. This business and personal libel aspect of Koufakis' case apparently was abandoned; there certainly was no proof as to such injury at trial. As relief, the counterclaim sought costs, legal fees, "punitive, exemplary and compensatory damages" of $1,000,000, and equitable relief. On May 2, 1967, Franchise Licensors filed a reply to the Koufakis counterclaim.

Thereafter numerous preliminary motions came before almost every judge in the Eastern District—a situation which happily is no longer possible since the judges of the Eastern District adopted the individual calendar system as of October 1, 1969.

After Judge Dooling had castigated both parties in July 1967 for smothering the simple issues in papers of "incredible prolixity," the matter was further complicated by Koufakis' filing a 57-page complaint, on August 25, 1967, in the New York Supreme Court for the County of Queens. The complaint made essentially the same charges asserted in the federal counterclaim; however, it named Thomas Carvel as an individual defendant and nine other corporations in the Carvel complex as corporate defendants, not including Franchise Licensors. This action was removed to federal court by the defendant Thomas Carvel on October 5, 1967, on the ground that the complaint as drawn charged Carvel and the several corporations with violations of the Sherman Act, the Clayton Act, and the Federal Trade Commission Act,[7] despite the fact that the complaint did not mention or cite any of these statutes and ignoring the fact that treble damages were not sought.

By memorandum and order dated January 5, 1968, Judge Weinstein granted Koufakis' motion to consolidate the removed action with the trademark infringement suit. In his opinion he alluded to the fact that the basis for removal jurisdiction was that the state-court complaint raised issues under the federal antitrust laws. We express no opinion on the correctness of this finding that federal jurisdiction of the removed action was proper,[8] for we believe that the removed action was actually of little importance; it added nothing of substance to the issues already before the federal court.

It is clear that the first move in the litigation between the parties was Franchise Licensors'; the action commenced on August 3, 1966, against Koufakis for trademark infringement was properly initiated in federal court. Franchised Stores of New York, Inc. v. Winter, 394 F.2d 664 (2d Cir. 1968); 28 U.S.C. § 1338(a). Franchise Licensors' related causes of action sounding in common-law unfair competition and breach of contract were also properly before the district court. Franchised Stores of New York, Inc. v. Winter, *supra*, at 670; 28 U.S.C. § 1338(b), Hazel Bishop, Inc. v. Perfemme, Inc., 314 F.2d 399 (2d Cir. 1963).

7. Thomas Carvel's removal petition also pointed out that the state-court complaint was a repetition of the federal counterclaim.

8. Removal would not be the proper course simply because the issues raised in the state court complaint and the federal counterclaims are identical. See Kline v. Burke Construction Co., 260 U.S. 226, 43 S.Ct. 79, 67 L.Ed. 226 (1922);

Wright, Federal Courts, § 47, pp. 152–156. Moreover, if the state court complaint did attempt to initiate an antitrust action, as Carvel alleged in the removal petition, the state court had no jurisdiction to hear it and the federal court thus could not hear it on removal. General Investment Co. v. Lake Shore & M. S. Ry. Co., 260 U.S. 261, 43 S.Ct. 106, 67 L.Ed. 244 (1922); Wright, Federal Courts § 38, 112–13 (1963 ed.).

We further hold that Koufakis' counterclaim in this action was compulsory under rule 13(a) of the Federal Rules of Civil Procedure, which provides:

A pleading shall state as a counterclaim any claim which at the time of serving the pleading the pleader has against any opposing party, if it arises out of the transaction or occurrence that is the subject matter of the opposing party's claim and does not require for its adjudication the presence of third parties of whom the court cannot acquire jurisdiction.

See generally, 3 Moore, Federal Practice, §§ 13.12, 13.13 (1968 ed., and 1969 Supp.). The counterclaim that the "Carvel complex" was engaged in a fraudulent scheme to breach the franchise agreement by wrongfully terminating Koufakis' dealership certainly arose out of the same transaction or occurrence that was the subject matter of Franchise Licensors' complaint.

The exceptions contained in rule 13 (a)[9] do not apply here, and thus "any claim which is logically related to another claim that is being sued on is properly the basis for a compulsory counterclaim." 3 Moore, *supra*, ¶ 13.13 at p. 33, see also Moore v. New York Cotton Exchange, 270 U.S. 593, 46 S.Ct. 367, 70 L.Ed. 750 (1926); Artvale, Inc. v. Rugby Fabrics Corp., 232 F.Supp. 814, 821–822 (S.D. N.Y.1964), aff'd 363 F.2d 1002 (2d Cir. 1966) (patent infringement suit, defendant counterclaimed for breach of contract not to sue for infringement, held compulsory counterclaim). There can be no doubt that this is such a case. Casting aside the abandoned allegations of libel, the issues are both simple and logically related. If Koufakis prevailed on his counterclaim that Franchise Licensors had breached the agreement by wrongfully terminating his franchise, Franchise Licensors' claim that Koufakis had infringed Carvel's trademark by improperly holding himself out as a Carvel dealer after termination had to fail. Similarly, Franchise Licensors contended that Koufakis had breached the agreement by selling diluted and contaminated products, and that this justified termination; Koufakis counterclaimed that this was not so and that the laboratory tests relied on by Franchise Licensors were either erroneous or fraudulent. Thus, proof related to the quality of the products sold in the store just prior to termination was relevant to the claims of both parties.

The subsequent action in state court added nothing new to the action by way of substantive claims. The only new element was the addition of the nine corporate defendants and Thomas Carvel as an individual defendant. At the pretrial conference, Judge Weinstein persuaded the attorneys to stipulate that the only parties defendant to Koufakis' claims would be Franchise Licensors and Thomas Carvel; the other nine corporations dropped out of the litigation at that time. Consequently the sum total of changes introduced by the removal and consolidation was the addition of Thomas Carvel as an individual defendant to Koufakis' claims. We therefore regard it as proper to consider Koufakis' compulsory counterclaim as having been amended to implead Thomas Carvel as an individual defendant on the counterclaim. See Federal Rules of Civil Procedure, rule 13(h), 19(a) (1), 20(a).[10]

In the pretrial conference for the consolidated actions, it was determined that the issues raised by Koufakis would be tried first to the jury, after which the trademark infringement claims would be

9. " * * * But the pleader need not state the claim if (1) at the time the action was commenced the claim was the subject of another pending action, or (2) the opposing party brought suit upon his claim by attachment or other process by which the court did not acquire jurisdiction to render a personal judgment on that claim, and the pleader is not stating any counterclaim under this Rule 13." Rule 13, *supra*.

10. Thomas Carvel was personally served in the state court action, and at the pretrial conference in federal court Mr. Toboroff consistently stated that he appeared representing Thomas Carvel.

tried by the court. After the jury had rendered its verdict in favor of Koufakis, the parties discussed the trademark claims with Judge Weinstein and agreed that the judgment would include an award of $100 to Franchise Licensors for trademark infringement by Koufakis. Neither party has appealed from this part of the judgment. Although it is clear from the record that the $100 award reflected Judge Weinstein's estimate of damages to the Carvel trademark due to sales by Koufakis of ice cream products not conforming to Carvel standards during a period from July 17 to August 2, 1966, in the present posture of the case that award constitutes full resolution of the trademark issues between the parties. Thus, on remand those issues may be out of the case, leaving for retrial only the issue of whether the appellants breached the contract by terminating Koufakis' franchise and, if so, the amount of damages.[11] Despite the possible absence of a trademark issue on remand, the case should remain in federal court. It is well settled that the jurisdiction of the federal district courts, once acquired in cases similar to the present one, does not necessarily fail due to subsequent actions by the parties such as amendment of their pleadings to drop all claims of trademark infringement. Hazel Bishop, Inc. v. Perfemme, Inc., 314 F.2d 399, 402–404 (2d Cir. 1963). See also, Armstrong Paint & Varnish Works v. Nu-Enamel Corp., 305 U.S. 315, 322–325, 59 S.Ct. 191, 83 L.Ed. 195 (1938); Clairol Incorporated v. Gillette Company, 389 F.2d 264, 267–268 (2d Cir. 1968); Cf. Brown v. Eastern States Corp., 181 F.2d 26, 28–29 (4th Cir.), cert. denied 340 U.S. 864, 71 S.Ct. 88, 95 L.Ed. 631 (1950). We see no point in applying a different rule in the present case, where the trademark issues may now be out of the case because of a settlement agreed upon by the parties after trial and after discussion with the trial judge.

### III. CONDUCT OF APPELLEE'S TRIAL COUNSEL

We come now to the appellants' principal contention on appeal: that the conduct of Koufakis' counsel, Mr. Irving M. Berg, during the trial and on summation, was so improper and prejudicial that the trial judge's refusal to grant appellants' motion for a new trial was an abuse of discretion. Appellee urges that a reading of the record as a whole supports Judge Weinstein's observation during argument on the motion for a new trial that "wrenching little pieces of argument out of a long record like this doesn't properly reflect the entire flavor of the trial, and in my opinion there was not the prejudice [which the defendants] suggest." We have read the record, and we cannot agree with this conclusion.

Trial counsel for the appellants, Mr. Weisman, objected to Mr. Berg's conduct at various times throughout the trial. He also objected to the summation at several points, despite the trial judge's expressed hope that such interruptions would not occur. After Mr. Berg's summation was complete, Mr. Weisman objected to it as improper, inflammatory, and prejudicial, and made a timely motion for a new trial. We are of the opinion that even absent these objections a new trial should have been granted in this case. It was the trial judge's affirmative duty to protect appellants from the grossly improper tactics adopted by counsel for the appellee. This he failed to do.

The single most important task of a district judge presiding at a trial before a jury is to exercise that degree of control required by the facts and circumstances of each case to assure the liti-

---

11. The judgment awarded $100 damages to Franchise Licensors, but Judge Weinstein stated at several points in the hearing on the post-trial motions that award was "without prejudice and with- out any res judicata effect." Although it is not clear what he meant by these statements, it is enough to point out that the resolution of this issue must be left to the judge who retries the case.

gants of a fair trial. This obligation does not arise only when objections are raised by one of the litigants or his counsel. Repeated improprieties by one counsel severely prejudice his adversary. Every trial lawyer knows that frequent objection is a potentially dangerous course of action the effect of which upon the jury cannot be estimated. Thus, the burden falls on the federal district judge to use his authority, whenever it becomes necessary, in such a way that the proceedings in the courtroom remain devoted to a reasoned and reasonable search for justice between the parties. Brown v. Walter, 62 F.2d 798 (2d Cir. 1933).[12]

Throughout his presentation at trial and in summation, Mr. Berg repeatedly went beyond the bounds of propriety and characterized opposing counsel, Thomas Carvel and the Carvel organization, and the testimony of witnesses offered by the appellants, in a manner wholly unjustified by anything in the record. Moreover, despite objection and admonition by the court, he continually referred to matters which were not in the record and which were not relevant. The prejudice inherent in Mr. Berg's improper conduct seems to us clear on the face of the record. In addition, the jury returned a verdict which Judge Weinstein felt compelled to reduce by more than $60,000 because, as he stated, "I cannot understand, myself, the way [the jury] computed it." Although we are not faced here with estimating the amount of damages properly recoverable, in assessing the impact which Mr. Berg's repeated improprieties had on the jury we cannot disregard the fact that the award was reduced by the trial judge as grossly in excess of the maximum recoverable under the theory of the case as he charged the jury. See Chica-

go & N.W. Ry. Co. v. Kelly, 84 F.2d 569, 576 (8th Cir. 1936).

Mr. Berg made many references to the Mafia in a way to liken Thomas Carvel to a head man in that organization. He repeatedly suggested that Carvel coerced the "little guys" in his organization by invoking the same kind of fear employed by the Mafia to keep its soldiers in line. At one point in his summation Mr. Berg referred to Thomas Carvel as "the top leader of the Mafia in a business way," and there were at least six other references to the Mafia in his closing argument. When at the close of Mr. Berg's summation appellants' counsel asked the court to instruct the jury to disregard any reference to the Mafia, the trial judge responded, "Yes, they understand that. Mr. Berg is not accusing Mr. Carvel of being a Mafia member."

Apparently the trial judge thought these references harmless. In passing on the motion for a new trial after the verdict was returned, he remarked that the jurors had appeared to him to be "amusedly tolerant" of Mr. Berg's analogies to the Mafia. It seems to us that the trial judge should not guess about the jurors' reactions to an obviously improper argument. It is his responsibility to prevent counsel from continually making improper arguments and using slanderous and baseless epithets. The trial judge should have categorically ordered Mr. Berg to stop making such remarks and given the strongest possible cautionary instruction. As the trial judge never did make clear that this aspect of Mr. Berg's argument was grossly improper, it is likely that both the jury and Mr. Berg considered his failure to intervene as tacit approval of the line of argument.

---

12. In *Brown*, Judge Learned Hand observed:

"A judge, at least in a federal court, is more than a moderator; he is affirmatively charged with securing a fair trial, and he must intervene sua sponte to that end, when necessary. It is not always enough that the other side does not protest; often the protest will only serve to emphasize the evil. Justice does not depend upon legal dialectics so much as upon the atmosphere of the court room, and that in the end depends primarily upon the judge."

Brown v. Walter, *supra*, at 799-800.

Another of Mr. Berg's themes throughout his opening statement, his remarks during the trial, and his summation was that the case was one which pitted a "little" and virtuous man of modest resources against a powerful and unscrupulous man with untold wealth. For example, on cross examination of one of appellants' witnesses, Mr. Berg asked the totally irrelevant and unwarranted question whether the witness had been to "all five of [Thomas Carvel's] townhouses." Mr. Berg returned to this theme time and again during his summation. He called Thomas Carvel a millionaire and a multi-millionaire. We quote a representative, albeit rambling, paragraph:

> We are not involved here with a year and a half, we are involved here with a lifetime business that had this man [Koufakis] not been framed, this man not been shopped by the top leader of the Mafia in a business way [Thomas Carvel]—you saw these people, you saw Mrs. Koufakis [she had not been a witness but was present in court], they are a wonderful couple, three wonderful children, they were entitled to a life. Multi-millionaires shouldn't run, you know the old story, you can't fight City Hall, but this is baloney, when you are right you fight anybody, and come into court, you will get justice, and the Judge sitting right here on the bench will give it to you whether you are a multi-millionaire or the biggest pauper, and the Judge will assign to you the best lawyer he can get if you need help. Today we are living with, we are socially minded, we are living in a different world.[13]

Remarks such as these, which can be taken as suggesting that the defendant should respond in damages because he is rich and the plaintiff is poor, are grounds for a new trial. Washington Annapolis Hotel Co. v. Riddle, 83 U.S. App.D.C. 288, 171 F.2d 732, 740 (1948); see also Robinson v. Pennsylvania R.R. Co., 214 F.2d 798, 801 (3rd Cir. 1954);

Altoona Clay Products, Inc. v. Dun & Bradstreet, Inc., 286 F.Supp. 899, 902–903 (W.D.Pa.1968).

A third tactic employed by Mr. Berg was to remark frequently in summation about the fact that Thomas Carvel—a party defendant—had failed to testify. It is clear that the jury is entitled to draw an inference adverse to a party when that party fails to testify. See San Antonio v. Timko, 368 F.2d 983, 986 (2d Cir. 1966); N. Sims Organ & Co. v. Securities and Exchange Commission, 293 F.2d 78, 80–81 (2d Cir. 1961); II Wigmore, Evidence § 289 (1940 Ed. and 1964 Supp.); McCormick, Evidence § 249 (1954). Judge Weinstein so instructed the jury in his charge. It follows that it is fair argument for counsel to note that an opposing party failed to testify. See San Antonio, supra, 368 F. 2d at 986. However, such comments cannot be carried too far. We think it clear that Mr. Berg misused his freedom to comment on Carvel's failure to testify.

Mr. Berg argued at length about this point on at least five separate occasions during his summation, referring often to the rigorous cross examination Carvel would have faced based on statements contained in his deposition, some parts of which had been read into the record at Mr. Berg's instance. At one point Mr. Berg stated:

> He [Thomas Carvel] is such a darn liar, you have no idea.
>
> \* \* \* \* \* \*
>
> Again, I say where is he hiding during these four days, where is he ladies and gentlemen.
>
> Do I need to tell you anything more?
>
> Where is he?
>
> Are you going to let a man win a case without even showing up?
>
> Are you going to let the big guy, the big trouble-maker, the assassin, the fellow who gives orders to the lit-

13. See also note 15, infra.

tle guy and then hides, are you leaving him off the hook?

He doesn't even have the nerve to come into this court of law, he is not a witness, he is the defendant.

If someone sued me for a million dollars, oh boy, I would be here.

When you have four hundred pages [of deposition] to show him— * * * well, if he was on the witness stand and I got through with him,—I will tell you what would happen, * * * I am so angry * * *. If he testified on this trial he would be held, the minutes would be referred to the District Attorney's Office to have an investigation.

Upon objection by appellant's counsel, the trial judge merely said "Don't go ahead * * * Don't go off on these tangents" and inquired solicitously whether Mr. Berg was tired.

Even assuming that there was sufficient evidence introduced to connect Thomas Carvel personally with the termination of the franchise, a point which we do not decide, Mr. Berg was not justified in converting Carvel's failure to testify into an opportunity to engage in repeated name-calling, such as referring to Carvel on other occasions as "liar," "faker," "phony," and "perjurious." See *San Antonio, supra*, 368 F.2d at 986. Moreover, the permissible inference from a party's failure to take the stand does not extend so far as to encompass a claim that the reason the party did not testify was that he was terrified of being exposed to the penalties of perjury by a devastating cross examination.

Mr. Berg also made improper remarks which called the attention of the jury to other litigation which was not part of the record. One such reference was to a suit by Mr. Berg's law partner against the Carvel organization for ten months' rent.[14] He also referred to numerous other suits by dealers against Carvel, intimating that they stemmed from the Federal Trade Commission investigation at which Koufakis had testified. He stated:

Remember, ladies and gentlemen, after the witnesses' testimmony for the Federal Trade Commission, we weren't only the ones that sued, Koufakis, there were twelve others. * * * Mr. Weisman was talking about other dealers. Mr. Weisman need not be the attorney in all the other cases besides the twelve, there are many more.

There was no evidence of such other proceedings in the record; these references were irrelevant, confusing, and prejudicial.

Along with this type of reference, Mr. Berg consistently misused the findings of the Federal Trade Commission trial examiner. The trial examiner found against Carvel, but he was reversed by the Commission on appeal. Judge Weinstein admitted and read to the jury some parts of the trial examiner's decision, since he quite properly viewed it as relevant to the question of appellants' motives in dealing with Koufakis after he had testified at that hearing. Mr. Berg, however, constantly went beyond the narrow purpose for which this decision was admitted. Without mentioning that the trial examiner's decision had been reversed, Mr. Berg alluded to it many times as establishing that the Carvel organization was an unscrupulous business concern. At the very end of his summation, plaintiff's counsel characteristically reminded the jury of the trial examiner's findings:

It is not for nothing that the Federal Trade Commission brought the hearing, which consumed over two

14. Mr. Berg described the suit as one which was not "tried with a jury, that was tried with an experienced judge and there was a verdict, he rendered a verdict, he was in our favor. I say let them deny it, and this was after a full trial involving Koufakis, the same dam'n thing over again—I am sorry, I apologize—the darn thing I meant—and this involved the judge, he rendered a verdict, he didn't believe Carvel about counsel's claim against Koufakis; and all that, and he gave a judgment and they paid us."

hundred witnesses, thirty-six days of trial and found Carvel, like you heard the findings. Right or wrong, the Commissioner found those findings, he was impartial. He didn't care who won, he wanted the truth, and so do I.

Instead of stopping counsel from making such repeated references and reprimanding him therefor, the trial judge was content to tell the jury that the findings were not really findings and that they had been reversed. We do not believe that this general statement was enough.

In addition, Mr. Berg's summation was replete with improper personal references to himself,[15] and to Mr. Weisman, trial counsel for the appellants.[16] It is enough to say in general that counsel's remarks were in reckless and purposeful disregard of all the proprieties; they went far beyond the permissible limits of fair comment on what was before the jury and dealt altogether too much with matters and considerations outside the record which were obviously intended to prejudice the appellants in the eyes of the jury and seek their favor for the plaintiff.

In summary, we think it clear that Mr. Berg so persistently and continuously abused the freedom afforded counsel that his presentation—particularly in summation—was based "on an appeal to passion and prejudice not warranted by the proof." Missouri-K.-T.R. Co. of Texas v. Ridgway, 191 F.2d 363, 370 (8th Cir. 1951); see also New York Central R.R. Co. v. Johnson, 279 U.S. 310, 49 S.Ct. 300, 73 L.Ed. 706 (1929); Chicago & N.W. Ry. v. Kelly, 84 F.2d 569 (8th Cir. 1936).

Appellee argues that some or all of the prejudice caused by Mr. Berg's many indiscretions were cured by the trial judge's charge. But where the number and gravity of counsel's improprieties reach the level presented by this record, the admonitions by the trial judge in the charge and in response to specific objections cannot possibly serve to cure all the prejudice. Brown v. Walter, *supra*, 62 F.2d 798 at 800; Chicago & N.W. Ry. v. Kelly, *supra*, 84 F.2d at

15. Several times Mr. Berg came very close to transgressing canon 15 of the A.B.A. Canons of Professional Ethics, which makes it "improper for a lawyer to assert in argument his personal belief in the justice of his client's cause." This canon has been incorporated into EC 7–24 and DR 7–106(c) (4) of the new A.B.A. Code of Professional Responsibility. In pursuing this theme, Mr. Berg told the jury that he wanted "full justice for my client, I want to be able to sleep nights * * *." He continued by stressing that the jury should set "an example to Carvel," and that they would be creating "history" and "precedent" which would "protect innocent people and others like him [Koufakis] * * * from fraud and deceit in the market place * * * [and] to promote honesty * * *." He summed up this portion of his argument by asserting, "I am telling you truthfully, honestly, you have a momentous job here if you want to protect the public * * *."

Arguments of this tenor have been condemned by the federal courts. See *Altoona Clay Products, supra,* 286 F.Supp. at 903; Barzelis v. Kulikowski, 418 F.2d 869, 870–871 (9th Cir. 1969).

16. Canon 17 of the Canons of Professional Ethics states that "[w]hatever may be the ill-feeling existing between clients, it should not be allowed to influence counsel in their conduct and demeanor toward each other * * * in the case." See also A.B.A. Code of Professional Responsibility, EC 7–37.

During debate over an objection before the jury, Mr. Berg stated "you know when he [Mr. Weisman] accuses me, he accuses the Judge * * *." Mr. Berg stated in his summation that "you can't assume a jury, twelve people are stupid, as Mr. Weisman thinks they are the way he argued." Referring to the presentation of the appellants' case by its attorneys, Mr. Berg commented shortly thereafter that "Goebbels always felt if you yell loud enough and often enough, building lies, lies, and you repeated it and repeated, there is always someone·who is going to believe it. Maybe they think they can do that here." Berg's parting shot at Weisman, at the very end of his summation, was equally improper:

"He (indicating Mr. Weisman) knows he got a wrong case; he did the best job, he knows you can't fight with nothing, when everything is against you."

576; *Altoona Clay Products, Inc., supra,* 286 F.Supp. at 903.

In answering Mr. Weisman's objections to Mr. Berg's conduct during argument of appellees' post-verdict motion for a new trial, Judge Weinstein observed:

> Your style [Mr. Weisman] is entirely different from Mr. Berg's, and, again, without criticizing Mr. Berg, obviously, I prefer your style which is the very careful understated reliable way of handling argument and presentation.
>
> Now, Mr. Berg has an entirely different style. It is going a little out of fashion now, but in any case of this kind where it runs as long as it did, the Jury becomes adjusted to that style.
>
> If you had mentioned the Mafia, then they would have taken you literally.
>
> Mr. Berg's mentioning the Mafia or using this kind of charge was looked on with a smile by the Jury.
>
> They simply didn't take this kind of analogy seriously.
>
> This is the kind of exaggeration that they had come to expect from a flamboyant individual.

We cannot accept the trial judge's conclusion that the jury did not take Mr. Berg seriously as to much, if not all, that he said in his summation. On the contrary, we are persuaded that the large verdict was due in great part to Mr. Berg's improper conduct. The appellants are entitled to a new trial at which they will be free from such mistreatment by counsel. Brown v. Walter, 62 F.2d 798, 799–800 (2d Cir. 1933).

As there must be a new trial we proceed to pass upon two additional claims of error made by the appellants.

## IV. PUNITIVE DAMAGES

The appellants claim it was error for the trial judge to charge the jury that it could consider whether or not to award punitive damages. They also claim in effect that the error in leaving this question to the jury for an answer by special verdict was a factor in the jury awarding the damages which were reduced by the trial court as being excessive, and thus that it constitutes a further reason for reversal. The jury in fact found in their special verdict that the plaintiff was not entitled to punitive damages.

We assume, as the parties have in their briefs, that New York law governs the question of the propriety of awarding punitive damages on the compulsory counterclaim. The next problem is the familiar one of predicting what New York's highest court would say about punitive damages in a case such as this one. The New York precedents are of two kinds: some opinions consider only whether the allegations in a pleading seeking punitive damages are sufficient, if proved, to support such an award; other opinions review the evidence presented to determine whether it establishes that the award was a proper one. Obviously, the approach taken by the New York courts differs somewhat depending on the proof. From a study of the New York precedents, we conclude that New York would not permit an award of punitive damages in a case such as this. Accordingly, that issue may not be submitted to the jury on retrial of this action.

It is clear that the New York courts will not impose punitive damages on a corporation unless the officers or directors of the corporation authorized, participated in, consented to, or, after discovery, ratified the conduct giving rise to such damages. See, Roginsky v. Richardson-Merrell, Inc., 378 F.2d 832, 842 (2d Cir. 1967), and New York cases cited therein. In the present case, as we have stated, the allegations of libel in Koufakis' counterclaim were never proved and thus they do not enter into our consideration of the issue. What is left are the allegations that the "Carvel complex"—including defendant Thomas Carvel and others in the management of the multi-corporation structure—were

outraged when Koufakis testified in the Federal Trade Commission proceeding during November, 1963, and that they determined to get rid of him by terminating his dealership. According to the counterclaim, the means adopted to accomplish this end were

" * * * to take certain alleged samples of certain products in [Koufakis'] business; * * * to make detailed alleged inspections of [Koufakis'] premises; * * * to perform certain other acts calculated to make it appear that [Koufakis] violated the terms of his contract; whereas, in truth and in fact, the said inspections, examinations and results alleged by [Franchise Licensors], were false and untrue. * * * "

This boils down to saying that the St. Lawrence laboratory test results were falsified by Franchise Licensors, and that the corporation's management—principally Thomas Carvel—had some part in that falsification. We find insufficient evidence of management misconduct of the type required to subject the corporate defendant to punitive damages.

Carvel's inspector Mannino testified that he took the samples at Koufakis' store in the regular course of his employment as a field representative of Carvel and that no special orders from management caused him to visit the store in July, 1966. It is true that Mannino may have been careless in transporting some of the series of samples which he took from the store (the July 17th group) to the laboratory, but there is no proof that this was ordered by or known to the officers of the corporation. In any event, these samples constituted only the first of the long series of tests which we have described above.

Mr. Berg also attempted to suggest through his direct and cross examination of several witnesses that the samples were tampered with in some way at the laboratory on the premises of Carvel's home office. However, there is not a shred of evidence in the record to support such a theory.

There is very little other evidence which might be taken to support the punitive damage claim. Russo testified that Koufakis was one of a group of dealers who were considered to be "irritants" and that Thomas Carvel stated that, as a group, such dealers would be "worked out" of the Carvel system. However, Russo did not state that Carvel had referred to Koufakis specifically; the thrust of his testimony was that Carvel was concerned with a group of dealers who were slow-paying and who did not operate their stores in conformity with Carvel operating regulations. All of these matters seem to us to relate to permissible business judgment about the operation of the system and nothing more. In addition, we note that these statements were made in March, 1963, months before Koufakis testified for— or was contacted by—the Federal Trade Commission.

The last bit of evidence which might support the punitive damage claim is the fact that Koufakis was not invited to the annual Carvel convention in December, 1963, one month after testifying before the Federal Trade Commission. When he did not receive an invitation, Koufakis telephoned the Carvel offices to say that he would like to attend; in reply to that call he received a letter dated December 30, 1963. The letter stated that attendance at the convention was by invitation only and that Koufakis' threat to attend without an invitation "was not taken in a good light." The letter was signed "Carvel Franchise Systems."

While this evidence discloses lack of a friendly relationship, it does not connect the management of Carvel, or Thomas Carvel personally, with the alleged falsification of laboratory tests.

A second rationale for our holding on this question is simply that the New York courts would not allow punitive damages in a case where the claim advanced is essentially one of breach of contract. A breach is a breach; it is of marginal relevance what motivations led to it. The most recent New York deci-

sions indicate that the state courts should be very selective in allowing punitive damage awards; the factors considered in exercising this selectivity include the nature of the conduct, the sufficiency of an award of compensatory damages and other remedies to deter such conduct in the future, and the likelihood that an award of compensatory damages would induce the plaintiff to sue. See Walker v. Sheldon, 10 N.Y.2d 401, 223 N.Y.S.2d 488, 179 N.E.2d 497 (1961).

In Walker v. Sheldon, the complaint alleged that plaintiffs were induced to enter into a contract with defendants by means of fraudulent representations by the individual defendants who were officers of the defendant corporation. The New York Court of Appeals, in a 4–3 decision, upheld an order of the Appellate Division which permitted that part of plaintiffs' pleadings advancing the claim for punitive damages to stand. The court stated:

> " 'It is not the form of the action that gives the right to the jury to give punitory damages, but the moral culpability of the defendant.'
>
> "Although [punitive damages] have been refused in the 'ordinary' fraud and deceit case [citations omitted], we are persuaded that, on the basis of analogy, reason and principle, there may be a recovery of exemplary damages in fraud and deceit actions *where the fraud, aimed at the public generally, is gross and involves high moral culpability.* And this court has—in line with what appears to be the weight of authority—sanctioned an award of such damages in a fraud and deceit case where the defendant's conduct evinced a high degree of moral turpitude and demonstrated such wanton dishonesty as to imply a criminal indifference to civil obligations." [Citation omitted, emphasis added.]

Walker v. Sheldon, *supra,* at 404–405, 223 N.Y.S.2d at 491, 179 N.E.2d at 498.

The Court of Appeals concluded that "[w]hat is asserted [in Walker v. Shel-

don] *is not an isolated transaction incident to an otherwise legitimate business, but a gross and wanton fraud upon the public." Id.* at 406, 223 N.Y.S.2d at 492, 179 N.E.2d at 500. Thus, plaintiff was permitted to plead and attempt to prove these allegations supporting the claim for punitive damages.

In the recent case of James v. Powell, 19 N.Y.2d 249, 279 N.Y.S.2d 10, 225 N.E.2d 741 (1967), the Court of Appeals reversed an award of punitive damages against defendant Adam Clayton Powell for fraudulently conveying title to realty in Puerto Rico in order to prevent collection of a New York judgment. The court quoted Walker v. Sheldon; from that earlier opinion, it extracted the language "where the fraud, aimed at the public generally, is gross and involves high moral culpability," 19 N.Y. 2d at 260, 279 N.Y.S.2d at 18, 225 N.E. 2d at 747, as the controlling test. The court then stated that

> "The fraud here asserted—aimed at removing a judgment debtor's property from the reach of an execution—does not fall within that category. Furthermore, effective remedies are provided against fraudulent conveyances, including the assessment against the tort-feasors, in appropriate cases, of the costs incurred in pursuing such remedies, and there is no need to offer the prospect of punitive damages as an inducement to institute suit. [Citing Walker v. Sheldon, *supra.*] In short, the defendant Powell may have committed a wrongful act, but his conduct was not so 'gross and wanton' as to bring it within the class of malfeasances for which punitive damages may be awarded."

The present dispute between the parties to a business contract, with some history of troubled relations over the years, does not measure up to the standards to be gleaned from Walker v. Sheldon and James v. Powell. See American Electronics, Inc. v. Neptune Meter Company, 30 A.D.2d 117, 290 N.Y.S.2d 333 (1st Dept. 1968) (defendants wilfully engaged in a course of conduct violative

of elemental standards of morality in the business community in order to win a public contract at plaintiffs' expense, *held,* plaintiffs not entitled to punitive damages since no public right was involved and the underlying private wrong was susceptible of adequate compensation). First, this case does not, as did Walker v. Sheldon, present a fraud "aimed at the public generally." We think it significant that the New York Court of Appeals in James v. Powell quoted that particular portion of Walker v. Sheldon, and that James v. Powell involved a dispute between only two parties.

Second, we do not believe that the present case is one where the possibility of punitive damages is necessary to induce suit to right a wrong which otherwise would go unpunished. The breach of contract action, with the possibility of substantial compensatory damages, is sufficient to induce suit and provide deterrence.

## V. COMPENSATORY DAMAGES: THE POSSIBILITY OF A RENEWAL TERM

█ The appellants claim that the trial judge committed reversible error by instructing the jury that, if they found a substantial breach of the franchise contract by the defendants, they were entitled to consider the possibility of a ten-year renewal of the franchise in assessing compensatory damages. We disagree.

The franchise contract expressly provided that "this agreement shall be automatically renewed for an additional period of—0—years * * *." This automatic renewal clause was a printed provision on Carvel's standard form franchise contract, and the "—0—" was typed into the blank space there provided. In spite of Franchise Licensors' argument, based on this clause, that renewal was precluded by the contract, Judge Weinstein charged the jury that:

"There was testimony that it was the practice for Carvel to renew the franchise for another ten-year period.

If you find that it would have been renewed, you may include any damages suffered by [Koufakis] by not being able to run his Carvel store during this additional renewal period or by not being able to sell the franchise during that period."

It is hardly accurate to characterize the quoted clause as specifically excluding "any right of possibility of renewal." The provision does preclude automatic renewal, and we agree that Koufakis had no contractual right to a renewal term. However, the agreement says nothing to exclude the possibility of a subsequent decision by the parties to renew for another term. In calculating damages, the jury was entitled to consider this possibility once they had determined that Franchise Licensors' termination of the contract was improper. Of course, the question is purely one of fact, and should be submitted to the jury only if there was evidence in the record that renewal was reasonably likely under all the circumstances. Simpson v. Union Oil Co., 411 F.2d 897, 909 (9th Cir. 1969) rev'd on other grounds 396 U.S. 13, 90 S.Ct. 30, 24 L.Ed.2d 13 (1969); see also, *Id.,* at 15–16, 90 S.Ct. 30 (Black, *J.,* concurring and dissenting).

There is ample testimony in the record to support Judge Weinstein's determination to let the issue of renewal go to the jury. Most important is the testimony of John W. Stewart, who was general manager of the Carvel operation and a nephew of Thomas Carvel. On direct examination by Mr. Weisman, he testified that if a dealership was profitable, the Carvel organization's policy was to "do everything possible to try to renew that store and keep it on location." This statement was followed by the following question and answer:

"Q. Now is it fair to say that except for abnormal conditions it is the policy of the company to try and get an extension of the lease and to try and keep the same dealer in the same store? A. Yes sir."

Stewart further testified that prior to the time in 1966 when the series of tests were run at the Koufakis store there had been no decision made or discussion about whether to renew Koufakis' franchise when it expired in 1968.

In addition, Koufakis testified that "I don't know of anybody who had problems getting renewals. I know several people who renewed their franchise with their leases together."

We must consider this testimony in the light of the type of business relationship which this franchise agreement —and many others like it—delineates. See generally, Gellhorn, Limitations on Contract Termination Rights—Franchise Cancellations, 1967 Duke L.J. 465 (1967); Franchise Symposium, 15 N.Y. Law Forum 1–118 (1967).[17] There is considerable force to appellee Koufakis' argument that a franchisor and those who assume the role of dealer do not intend the time clause of the agreement as a rigid outer limit to the duration of their relationship.

Koufakis' proof as to his start-up costs is relevant to the question of renewal. He invested a substantial amount in constructing the building which housed the store and in buying equipment for it. As Stewart's testimony indicates, once stores began operation Carvel tended to focus attention, reasonably enough, on the profitability of the operation to them. Obviously, both parties to the contract had a substantial amount to gain by an ongoing and successful operation of each franchised store as a business entity.[18] The fran-

chisee has his investment to protect. The franchisor, although his motivations are more complex, also wants to avoid termination. As one commentator has observed:

> "The very essence of the franchise system is the reliance upon multiple centers of management skill and energy represented by the franchisees, rather than upon the single source represented by the franchisor. The franchisor who terminates his franchise indiscriminately will soon find himself unable to operate the terminated locations himself or re-franchise them rapidly and will be saddled with the ultimate eyesore: the franchised location closed down, even for a short period, for lack of management. All the evidence points, rather, to the conclusion that franchisors will go to extraordinary lengths to prevent franchisees from abandoning their sites."

Zeidman, Legislative Supervision of the Franchise Contract: Throwing out the Baby with the Bath Water?. 15 N.Y. Law Forum 19, at 35 (1969).

It is possible, of course, that the duration of the agreement will operate as an outer limit on the duration of the relationship of the parties. If Carvel found that the Koufakis dealership was unprofitable, they would presumably have had serious reservations about renewal when the first ten-year period ran out. Similarly, it is not inconceivable that the relations between the Carvel organization and Koufakis were so abrasive— even absent the incidents of July and August of 1966—that the franchise

---

17. Discussing the importance of franchising in the economy, one commentator observed in 1969:

The impressive growth of franchising in America is a phenomenon of the last 20 years, yet statistics show that franchising already accounts for more than 10% of this nation's Gross National Product and more than 25% of all retail sales. The popular rationale for this remarkable growth is that franchising combines the marketing knowhow and trademark good-will of big business with the entrepreneurial advantages of small business.

Zeidman, Legislative Supervision of the Franchise Contract: Throwing out the Baby with the Bath Water?. 15 N.Y. Law Forum 19 (1969). This article discusses proposed legislation introduced in Congress to regulate the franchise relationship, some of which focuses upon abuses in the termination or cancellation of franchises. See e. g., S. 2321 (as amended), 90th Cong., 2d Sess., § 3 (1968); S. 1967, 91st Cong., 1st Sess., §§ 3, 4 (1969).

18. Zeidman, *supra* note 17, at 29, 35.

would not have been renewed upon its scheduled expiration on July 31, 1968. Of course, the jury was entitled to consider evidence of this kind in deciding on the probable time span for the computation of damages.

When he discussed the attorneys' requests to charge and the proposed charge on this question, Judge Weinstein expressed what we think is the proper rationale:

"[W]e have testimony on [the general renewal practices of Carvel] and we have to look at the realities of commercial enterprise, and you know as well as I do that when someone puts that much money into it they expect, * * * if they are doing a good job, [that] they are going to be renewed.

The jurors know that as well as we do. It is a lifetime job, these franchises are advertised generally as providing a business for your future."

See Wilson, An Emerging Enforcement Policy for Franchising, 15 N.Y. Law Forum 1, 13–14 (1969) (disucssing recruitment of franchisees).

We hold that the issue of a possible renewal was properly submitted to the jury.

Reversed and remanded for a new trial. No costs.