510 F.2d 500
 88 L.R.R.M. (BNA) 2842, 76 Lab.Cas. P 10,673
 Peter F. CLARK, as President of Ice Cream Drivers and
Employees Union Local 757, and Anthony Iorio, as President
of Milk Drivers and Dairy Employees Union Local 680, both
affiliated with the International Brotherhood of Teamsters,
Chauffeurs, Warehousemen and Helpers of America, an
unincorporated association, et al., Plaintiffs-Appellees-Appellants,
v.
KRAFTCO CORPORATION, Defendant-Appellant-Appellee.
 Nos. 135, 414, Dockets 74--1551, 74--1605.
 United States Court of Appeals,
Second Circuit.
 Argued Oct. 15, 1974.
Decided Feb. 6, 1975.
 
 John F. Cannon, New York City (Sullivan & Cromwell, New York City, of counsel), for Kraftco Corp.
 Samuel J. Cohen with whom Stanley M. Berman, New York City (Cohen, Weiss & Simon, New York City, of counsel), for Union Officers and Trustees of the Pension Fund.
 Before DANAHER,* Senior Circuit Judge, and FEINBERG and MULLIGAN, Circuit Judges.
 DANAHER, Senior Circuit Judge:
 
 
 1
 Senior Circuit Judge Lumbard, sitting without a jury, determined after a two-day trial that the plaintiffs were entitled to recover from Kraftco Corporation (herein, Kraftco), the sum of $576,000, with interest. Suit had been brought on behalf of the Ice Cream Industry-Drivers and Ice Cream Employees Unions Pension Fund (herein, Pension Fund). The parties had entered into an agreement which provided for an actuarial determination of the impact, if any, on the Pension Fund which might follow Kraftco's termination of certain phases of its Newark operations. The precise meaning of the language of the contract had given rise to conflicting assessments of Kraftco's possible liability.
 
 
 2
 After full consideration of the record and of the claims and briefs of the parties, we are satisfied that the plaintiffs are entitled to prevail. Accordingly, the judgment of the district court is reversed, and we remand with directions that judgment be entered in behalf of the Pension Fund for recovery from Kraftco** of $978,100, with interest.
 
 
 3
 For an understanding of the background of the relationships between the respective parties, we may note, first, that a Pension Fund had been established in 1952, pursuant to Section 302 of the Labor-Management Relations Act of 1947, 29 U.S.C. Section 186. Kraftco and some 48 other employers of employees in the dairy industry were bound to make contributions to the Pension Fund as provided in the basic Trust Agreement, and also in some situations, in accordance with written collective bargaining agreements between certain employers and the Union representing their employees. Kraftco as such a participating employer had been bound under its Breyer-Newark agreement with Local 680 not to remove its ice cream manufacturing and distribution operation from the area of Local 680.
 
 
 4
 Kraftco, deeming its Breyer-Newark operation inadequate, decided to transfer the production phase to its Long Island City plant with its much greater capacity. Even though its Breyer-Newark agreement was to expire by the latter part of April, 1968, Kraftco concluded it would be good business to continue in New Jersey the distribution of its ice cream and frozen food items to be produced at its Long Island City plant. Kraftco served notice informally upon counsel for Local 680 that it intended to curtail its Newark operations, and so it initiated inquiry as to the position Local 680 might take respecting Kraftco's contemplated transfer. Local 680 refused to respond. 'Negotiations about the Newark plant were not held until after Kraftco formally withdrew from the industry-wide negotiations and brought in unfair labor practice charge against Local 680 based on its refusal to bargain on the subject.'[1] Both Local 680 and Kraftco were represented by able and highly qualified spokesmen, quite familiar with the respective dealings of the parties over the years.
 
 
 5
 Finally on April 25, 1968, the Unions represented by their counsel and their respective presidents, met with representatives of Kraftco in New York. No representatives of Martin E. Segal & Co., Inc. (hereinafter, Segal Company), were present, although that company had long been and at the time still were actuarial consultants to the Pension Fund. Industry negotiations on a new Industry Area-Wide Agreement were going on elsewhere in the same hotel. 'The industry negotiations were successfully concluded, with Kraftco as a signatory, after separate agreement was reached with the Union on the Newark closing.'[2]
 
 
 6
 So it was that the parties entered into what came to be known as the 'Breyer Agreement.' It therein was agreed that Kraftco could on and after November 2, 1968, discontinue production at Newark, and relocate its Newark distribution facilities from which to distribute ice cream and frozen food products manufactured in Long Island City. That agreement further provided a severance pay plan as to permanently terminated Newark employees. We turn now to the Agreement's third paragraph which reads:
 
 
 7
 The consultants to the pension fund shall make an actuarial study of the impact, if any, of the discontinuance of operations and the termination of the employees upon the pension fund as of the date of the discontinuance of such operations, the cost of which shall be borne jointly by the company and the fund. If the consultants to the fund determine that the fund has been adversely affected as a result of the discontinuance of operations by the company at its Newark facility, the company agrees to pay to the fund the sums determined by the consultants. The decision of the consultants shall be final and binding on the parties. (Emphasis added.)
 
 
 8
 Some months later the 'consultants to the Pension Fund' made the determination that the fund had indeed been adversely affected, and the plaintiffs made demand that Kraftco pay to the Pension Fund $978,100, the sum determined by the consultants. Upon Kraftco's refusal to make that payment, this action was commenced pursuant to Section 301 of the Labor-Management Relations Act of 1947, 29 U.S.C. Section 185.
 
 
 9
 * In due course the plaintiffs moved for summary judgment, filed their statement of material facts pursuant to Rule 9(g) of the District Court, and further relied upon the affidavit of their counsel who had participated in the negotiations on April 25, 1968, leading up to the Breyer Agreement. Kraftco filed its answer, denying liability and asserting by way of defense that Kraftco and the Unions had merely 'attempted . . . to express an intention that a particular actuarial study of the Pension Fund be made.' Further pleading that the plaintiffs had no claim based upon the Breyer Agreement upon which relief could be granted, Kraftco demanded judgment dismissing the complaint. Kraftco's Response to plaintiffs' Statement under Rule 9(g) and for its own Statement under the Rule, admitted the execution of the Breyer Agreement but insisted that it had not been nor was it intended to be a 'separate and distinct contract,' but rather that the matters to which the Breyer Agreement related were regulated by other relationships between the parties, including the basic agreement and declaration of trust and the collective bargaining agreements annexed to the complaint. As for Kraftco's 'own' statement under the Rule, Kraftco asked a series of questions, the effect of which particularly was to challenge as a 'proper interpretation of the intent of the parties' the plaintiffs' claim that the Segal Company had been given unlimited authority to adopt whatever procedures and assumptions and to make whatever study it wished. Kraftco thus submitted that the Segal Company's determination was to be limited and was to be predicated upon the basis of 'agreed procedures and assumptions consistently used' in the past. Kraftco contended that the Breyer Agreement itself and 'other pertinent documents and parol evidence prove that this was the intent of the parties.'
 
 
 10
 The extensive affidavits upon which Kraftco relied, and the then state of the record, persuaded Judge Tyler to conclude that the Breyer Agreement was ambiguous. After argument by respective counsel, Judge Tyler delivered an oral opinion reflecting his assessment of the problem and offered the parties an opportunity to produce further evidence, but respective counsel declined to do so. His opinion in Clark v. Kraftco Corporation, 323 F.Supp. 358 (S.D.N.Y. 1971), discloses the extent to which he had been impressed by Kraftco's representations. Retaining jurisdiction of the action, on March 24, 1971, Judge Tyler denied the plaintiffs' motion for summary judgment, ordered that the Segal Company determination be vacated, and then remanded 'the issue' to the Segal Company to make the actuarial determination contemplated by the Breyer Agreement. This determination was to be attended by the formalities that accompany an arbitration under Article 75 of the New York Civil Practice Law and Rules. Particularly, Judge Tyler directed that the determination and report back to him
 
 
 11
 be made only by an actuary of the Segal Company and shall be consistent with the funding practice of the Pension Fund, . . .
 
 
 12
 (and) . . . be made in conformity with the Breyer Agreement as construed by the Court's opinion of February 26, 1971 and in this regard consideration may be given to the affidavits and exhibits of record on this motion.
 
 
 13
 (Emphasis added.)[3]
 
 II
 
 14
 These plaintiffs thereupon appealed, only to be confronted by Kraftco's motion to dismiss. The Union plaintiffs had insisted that the Breyer Agreement was final and binding on Kraftco. Deciding that the District Court's order was interlocutory only, this court did not undertake to consider the basic substantive issues. Our opinion noted that Judge Tyler had simply denied summary judgment on his construction of the contract, and then had ordered that the issues be tried. Clark v. Kraftco Corporation, 447 F.2d 933 (2 CA 1971).
 
 III
 
 15
 The case then came before Judge Lumbard. His pre-trial order noted that Kraftco had made no claim of fraud or personal misconduct in the Segal Company's appraisal proceedings. Judge Lumbard's opinion of February 19, 1974, reflects his consideration of three possible approaches by the Segal Company, all of which had been compiled pursuant to Judge Tyler's order, supra. He noted that when the case was before Judge Tyler
 
 
 16
 the court held that the critical paragraph 3 of the (Breyer) agreement was ambiguous and that, according to the scope of the authority granted the actuary, any ambiguity concerning the intent of the parties was for the court to resolve. Under the doctrine of the law of the case applicable in this circuit, Judge Tyler's holding should not now be upset unless it is contrary to the 'good sense' of the court. Zdanok v. Glidden Co., 327 F.2d 944, 952 (2d Cir. 1964).[4]
 
 
 17
 For his own part Judge Lumbard noted the contention of the plaintiffs that the Breyer Agreement was broad but unambiguous and so came under the parol evidence rule. Evidence at trial had been accepted, in part, subject to the plaintiffs' objection that such evidence should not have been received as having become merged into the final agreement of April 25, 1968. Without finding grounds upon which to set aside Judge Tyler's previous holding and order, Judge Lumbard concluded 'on the basis of the actuary's (Segal Company's redetermination) report of August 27, 1973, and on the other evidence at trial relating to the testimony before the actuary, that paragraph 3 of the Breyer Agreement' (emphasis added)[5] was indeed ambiguous, as Judge Tyler had held. He thus overruled the plaintiffs' objection to the admission of such evidence even though the Segal Company's report of August 27, 1973, had incorporated in its 'History' much of the very sort of material that had been objected to before Judge Tyler.
 
 
 18
 That actuary's report noted that the plaintiffs had presented no evidence but contended that the original calculation was binding. That report further recited that 'the Actuary has felt himself bound by the language of the Court both in its Opinion and its Order as well as by the various arguments, affidavits, depositions, and other material submitted by both parties and the Fund Office.' Thus, evidence which plaintiff had contended throughout had improperly been offered to vary the terms of the written contract, erroneously became effective, not in terms of what the agreement objectively had said on the face of the contract, but on the basis of what Kraftco had argued subjectively it had 'meant' when it signed the Breyer Agreement. One is reminded of Judge Friendly's inquiry 'What is chicken?' See Frigaliment Importing Co. v. B.N.S. International Sales Corp., 190 F.Supp. 116, 117, 121 (S.D.N.Y.1960), for a discussion of 'subjective' versus 'objective' intent.
 
 
 19
 Judge Lumbard's opinion discloses his realization that
 
 
 20
 . . . even though all employers contributed the same amount per employee hour, some employers stood at a relative advantage to others in that their employees received benefits in greater portion than the assumed normal benefit level of the Fund. It was the employers' decision, however, that these relative cost advantages to some should be overlooked in view of the overall cost savings in a multi-employer plan.[6]
 
 
 21
 His opinion, id., 85 LRRM at 3034--3035, analyzes each of the three plans submitted in the Segal Company's redetermination report. He saw that Kraftco's figures and assumptions would have resulted in a contribution deficit of only $135,100 by ignoring the relative cost advantage which had accrued to Kraftco in the past. On this theory, remaining contributors to the Fund would have been picking up an element of Kraftco's cost over the future years of the Fund's operation. Judge Lumbard rejected both the Segal Company's first calculation, as did Judge Tyler, and the Kraftco-sponsored approach.
 
 
 22
 The actuary's third possible method of calculation, Judge Lumbard found, included reimbursement to the Fund for the added cost occasioned by the loss of Kraftco's anticipated contributions. Without our detailing all component data, we note Judge Lumbard's conclusion that the third method of calculation resulted in a contribution deficit of $576,700. That approach was what Judge Lumbard decided had been
 
 
 23
 the one intended by the parties to the Breyer agreement and that by entering into the agreement Kraftco (had) obligated itself to defray any additional cost placed on the Fund participants by the Newark closing, but without forfeiting its own relative cost advantage due to the original decision to pool employee experience.[7]
 
 
 24
 Our reading of the Breyer Agreement discloses that these parties agreed that the consultants to the Pension Fund were to be called upon to make an actuarial study, the cost of which was to be borne jointly by Kraftco and the Pension Fund. If those consultants were to determine that the fund had been adversely affected as a result of the discontinuance of operations by the company at Newark, Kraftco was to pay to the fund the sums determined by those consultants. Specifically, the decision of the consultants, the parties said, 'shall be final and binding on the parties.' (Emphasis added.)
 
 
 25
 Those words in and of themselves would seem to mean precisely what they say. It may be said without invidious connotation, that Kraftco's forensic device of so constructing its record that 'ambiguity' purportedly could be discerned first had its 'impact' (to borrow an expression) upon Judge Tyler. The conclusion he thereupon reached permeated his order that the Segal Company make a redetermination[8] and report so as to reflect conformity with the Breyer Agreement as construed by Judge Tyler. The Segal Company was directed to take into consideration the affidavits and exhibits of record already before the judge. So it was that we find the Segal Company's redetermination report of August 27, 1973, had taken account of the arguments, affidavits, depositions, and other material previously part of the record before Judge Tyler. Thus, only because of evidence that entered the record by virtue of a purportedly discerned ambiguity was the Segal Company's new calculation different from the first one.[9]
 
 
 26
 Unmentioned heretofore is the fact that we have been dealing with collective bargaining agreements entered into pursuant to Section 302 of the LMRA, 29 U.S.C. Section 186. We have under inquiry a relationship, accordingly, of far greater significance than is to be attributed to an ordinary contract. Steelworkers v. Warrior & Gulf Company, 363 U.S. 574, 578--580, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960). Construction of contracts in this area surely is determinable by federal law. Zdanok v. Glidden Company,327 F.2d 944, 950 (2 CA), cert. denied 377 U.S. 934, 84 S.Ct. 1338, 12 L.Ed.2d 298 (1964), citing Smith v. Evening News Ass'n, 371 U.S. 195, 199, 83 S.Ct. 267, 9 L.Ed.2d 246 (1962).
 
 
 27
 Even where for example, there be an ambiguity with reference to an arbitrator's exercise of his authority, his award nevertheless may be enforced. In Steelworkers v. Enterprise Corp., 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960), the parties had bargained for the arbitrator's construction, but then had refused to follow it. After the court of appeals denied enforcement of part of the arbitrator's award, the Supreme Court reversed. The Court held that so far as an arbitrator's decision concerns construction of a contract, courts have 'no business overruling him because their interpretation of the contract is different from his.' Id. at 599, 80 S.Ct. at 1362. Thus, federal law, which leaves the parties to agree on their own enforcement mechanisms should apply here to favor the actuary's initial determination as 'final and binding.'
 
 
 28
 Here Kraftco bargained to achieve accord with the Unions for amicable termination of the Newark plant. That consent was achieved pursuant to the contract and the Breyer operation was terminated as of November 2, 1968. The Unions bargained for the preservation of their Pension Fund, and that is what the Breyer Agreement was about. That agreement specifically stated that the decision of the consultants was to be final and binding, words that hardly require research to discern their meaning. There was no fraud. There was no claim of lack of good faith. There was no suggestion that the agreement was not intended to be of binding effect, indeed the exact opposite was expressly stated. There was no effort by Kraftco to seek reformation of the contract. Kraftco even realized there would be an adverse effect upon the Fund, and had actuarial advice in advance of the agreement. Kraftco had submitted the proposed text to highly skilled attorneys whose specialty involved pension funds.
 
 
 29
 Only when the 'determination' as agreed had been made by the pension fund consultants does the record show a protest. 'Oh, no, we did not mean that' sums up Kraftco's position--even though the language of the Breyer Agreement specifically said that the consultant's determination would prevail.
 
 
 30
 Judge Lumbard's judgment is reversed. The case will be remanded for entry of judgment allowing the Pension Fund to recover from Kraftco Corporation $978,100, together with interest computed in accordance with the directions contained in Judge Lumbard's order.
 
 
 31
 No costs or attorneys' fees are to be allowed.
 
 
 32
 Reversed and remanded.
 
 
 
 *
 Senior Circuit Judge of the District of Columbia Circuit, sitting by designation pursuant to 28 U.S.C. § 294(d) (1970)
 
 
 **
 The parties have stipulated that Kraftco shall be considered the appellant for all purposes
 
 
 [1]
 Affidavit of David Campbell, Personnel Director of the Sealtest Foods Division of Kraftco
 
 
 [2]
 Affidavit of David Campbell, supra. n. 1
 
 
 [3]
 Order denying Motion for Summary Judgment, Clark v. Kraftco Corp., 70 Civ. 1246 (S.D.N.Y., March 24, 1971)
 
 
 [4]
 Clark v. Kraftco Corporation, 85 LRRM 3030, 3035 (1974)
 
 
 [5]
 Id., 85 LRRM at 3035
 
 
 [6]
 Clark v. Kraftco Corporation, supra, 85 LRRM at 3033
 Judge Lumbard, of course, had the advantage of the testimony at trial as he gleaned the background for his conclusions. Called as a witness for Kraftco, on direct examination Kraftco's expert explained the technique applicable in the field of pension and actuarial evaluations. He testified:
 . . . We have to work with our clients in establishing the assumptions that we are going to use in determining the forecasts that we are going to make, assumptions as to whether the number of employees is going to expand or decrease; whether the funds are going to be able to earn a certain rate of interest; how long people are going to live. Then having worked out those areas, we apply mathematical formulae, and we make detailed mathematical calculations. So we have two problems--we have the judgment items and we have the formula application. (App. 204)
 
 
 [7]
 Id., 85 LRRM at 3034--3035
 
 
 [8]
 Supplementing observations in his opinion, Judge Tyler's order read, in part:
 (1) The determination by the Segal Company shall, subject to waiver by stipulation of the parties, be attended by the formalities which normally accompany an arbitration under Article 75 of the New York Civil Practice Law and Rules.
 Appendix, 98; and see Clark v. Kraftco Corporation, 323 F.Supp. 358, 363 (S.D.N.Y.1971).
 
 
 [9]
 For greater detail respecting Judge Lumbard's summary of each of the three approaches assessed by him, see Clark v. Kraftco Corporation, 85 LRRM 3030, 3034--3035