195 F.3d 77 (2nd Cir. 1999)
 MARTIN BOZETARNIK, RAYMOND AKELEY and TERRANCE SLATE, Plaintiffs-Counter-Defendants,
GRAPHIC COMMUNICATIONS INTERNATIONAL UNION LOCAL 109-b, Plaintiffs-Counter-Defendant-Appellant,
v.
RICHARD MAHLAND, KEVIN KELLEY and JOHN BIRKHOFER, Defendants-Counter-Claimants,
QUEBECOR PRINTING BOOK PRESS, INC., Defendant-Counter-Claimant- Appellee.
 Docket No. 98-9192
No. 3790 -- March Term, 1999
 UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT
 Argued: March 19, 1999
Decided: October 20, 1999
 
 Appeal from a judgment of the United States District Court for the District of Vermont(Murtha, J.).
 
 
 1
 Affirmed.
 
 
 2
 STEPHEN S. ANKUDA, ESQ. for Plaintiff-Counter-Defendant-Appellant
 
 
 3
 PETER BARR ROBB, ESQ. for Defendant-Counter-Claimant-Appellee
 
 
 4
 RUSSELL F. MORRIS, JR., ESQ. for Defendant-Counter-Claimant-Appellee
 
 
 5
 Before: McLAUGHLIN, CALABRESI, and GIBSON,* Circuit Judges.
 
 JOHN R. GIBSON, Circuit Judge:
 
 6
 Local 109-B of the Graphic Communications International Union appeals the summary judgment entered against it in this dispute over the proper method for increasing members' pension benefit levels. The pension committee in charge of administering the local's pension plan voted to raise benefit levels, but the employer of the local's members, Quebecor Printing Book Press, Inc., refused to implement the increase on the ground that the committee had no power to increase the benefits. The local brought this suit against Quebecor, seeking arbitration of the dispute and a declaration of the local's rights under the parties' collective bargaining agreement and pension plan. On cross motions for summary judgment, the district court held that the committee had no power under the parties' collective bargaining agreement or the pension plan to increase the benefits; accordingly, the court entered summary judgment for Quebecor. We conclude that the governing documents unambiguously reserve to Quebecor the power to amend the plan. Therefore, we affirm the judgment of the district court.
 
 
 7
 Key to this dispute are the collective bargaining agreement and pension documents the parties adopted. The local's collective bargaining agreement with Quebecor dictates that Quebecor must pay forty cents into the pension fund for each hour worked by local members. The collective bargaining agreement has no provision for how that money is to be spent. The schedule of benefits is prescribed in the pension plan, and the amount of benefits has no direct relation to the forty cents per hour contribution required by the collective bargaining agreement. Instead, under the pension plan, an employee's accrued annual benefit is figured by multiplying the employee's years of service by a dollar amount. There is also a trust document for the pension fund, of which the parties have made only a few pages part of the record.
 
 
 8
 The collective bargaining agreement refers to the pension plan, stating that the name of the fund is "G.C.I.U. 109-B Pension Fund" and that the employer and union shall have equal representation on the "Pension Committee." The collective bargaining agreement then refers to the "Board of Trustees," which shall be composed of equal numbers of persons from the employer and the union. The trust agreement provides that the members of the board of trustees and the pension committee are identical. The collective bargaining agreement designates the board of trustees as the "policy-making body" and gives the trustees the power to make "[a] change of carrier or type of plan."
 
 
 9
 The collective bargaining agreement also contains an "Alternate Article 24" which, had the union members voted to adopt it, would have fundamentally changed the nature of the employer's obligation. Under Alternate Article 24, the employer would have been obliged to pay a defined benefit, rather than contributing the forty cents per hour worked. The collective bargaining agreement stated that if Alternate Article 24 were adopted during the term of the agreement, then the trustees "will cause the necessary action to be taken to increase the plan benefit to twenty-four ($24.00) dollars per month, per year of credited benefit service effective with the first month after said adoption." The union members did not adopt Alternate Article 24.
 
 
 10
 The pension plan designates the pension committee as the "Plan Administrator." Article IX, "Administration," provides:
 
 
 11
 The Plan Administrator shall have the sole discretion to interpret the provisions of the Plan and to determine all questions that may arise hereunder. The Plan Administrator shall determine the Retirement Benefits payable under the Plan, or he may rely on the certification of the amount of Retirement Benefits by the Actuary.
 
 
 12
 The pension plan's Article X, "Discontinuance of Company Contributions - Plan Amendments and Mergers," states: "Subject to the collective bargaining agreement between the Employer and Local 109B, the Employer shall have the right to amend this Plan at any time and to any extent that it may deem advisable." The article then limits Quebecor's right of amendment, prohibiting any amendment that would vest in the employer control or interest in the pension fund's money or that would deprive retired beneficiaries of benefits under the plan as it existed when they retired.
 
 
 13
 Pension committee minutes reflect that the pension committee had amended the plan's benefits on three occasions antedating the present collective bargaining agreement. First, the minutes for September 14, 1993 show that the committee discussed whether to increase benefits or instead to use a different actuarial table that would allow Quebecor to maintain the deductibility of the plan without raising benefits. Although these minutes are sketchy, they suggest that the plan was in danger of becoming overfunded, thereby threatening the deductibility of the plan. Quebecor's representative suggested using a different actuarial table (presumably a more conservative one), rather than passing a large benefit increase, to address the deductibility problem. The minutes show that Quebecor's representative proposed a small benefit increase, which did not pass, and that a local representative then proposed a large increase, which did not pass, either. Finally, the committee passed a compromise increase in an amount that fell between the two rejected proposals. Second, on July 26, 1993, a Quebecor representative made a successful motion to amend the plan to include a preretirement death benefit. Third, the February 20, 1991 minutes include a correction to the December 11, 1990 minutes to show that the future service benefit was increased at the December meeting.
 
 
 14
 At the August 22, 1996 meeting of the pension committee, the union-appointed committee members invited an actuary to discuss the current financial state of the pension fund in relation to the liability of the fund at the current benefit levels. According to the minutes, the actuary stated that the "current 40 cents per hour contribution was more than enough to support the current unit benefit." A union-appointed committee member then moved "to increase the unit benefit effective 7/1/95 to $21.00 with a full benefit age 62, which requires a contribution rate of 38.8o per hour." The only employer-appointed committeeman present objected that the committee did not have the power to enact the increase. When the union-appointed members made clear that they intended to vote on the measure, the employer-appointed member asked for a recess so he could retrieve proxies he had from the other two employer-appointed members. Quebecor contends that the union-appointed committee members did not allow the employer-appointed member to retrieve or vote the proxies, but the record is equivocal. The minutes record the vote as a tie, "3 votes aye . . . 3 votes nay," as if the proxies were voted; however, the minutes later state that the motion carried.
 
 
 15
 Quebecor refused to recognize the August 22, 1996 increase as legitimate. The local filed a petition in the district court to compel arbitration of the dispute, then amended to add claims for a declaration of the local's rights. The parties filed cross motions for summary judgment.
 
 
 16
 The district court entered summary judgment for Quebecor. The court reasoned that the provision in the pension plan giving the pension committee power to "determine retirement benefits" only "connotes the computation of established benefits for a specific pension applicant." The court held that under the contractual provisions in this case, the benefit levels could only be increased after collective bargaining.
 
 
 17
 On appeal, the local argues that specific contractual provisions entrust the committee with power to increase benefits, and that the parties' past practice of recognizing benefit increases voted by the pension committee has created a condition of employment which Quebecor cannot now change unilaterally. Quebecor responds that the contract and plan in this case do not permit amendment of the benefit levels by the trustees.
 
 
 18
 As a threshold issue, the local's attorney agreed at oral argument that the local waived any right to arbitration by seeking summary judgment in this case.
 
 I.
 
 19
 We review de novo the district court's grant of summary judgment. American Fed'n of Grain Millers v. International Multifoods Corp., 116 F.3d 976, 978 (2d Cir. 1997).
 
 
 20
 We first must examine the collective bargaining agreement and the pension plan to determine whether they give the trustees power to amend the benefit levels stated in the plan. See generally Siskind v. Sperry Retirement Program, Unisys, 47 F.3d 498, 506 (2d Cir. 1995) ("ERISA requires strict attention to the actual language of the plan's governing documents."). Although the collective bargaining agreement does not specifically incorporate the pension plan by reference, it refers to "the G.C.I.U. 109-B Pension Fund." The parties and the district court all read the collective bargaining agreement and the pension plan together as "a whole."
 
 
 21
 The plan reserves to Quebecor the power to amend the plan, subject to the collective bargaining agreement, and subject to two exceptions not relevant here. The local relies on language in the plan stating that the pension committee "shall determine the Retirement Benefits payable under the Plan, or [it] may rely on the certification of the amount of Retirement Benefits by the Actuary." In light of the plan's explicit statement of benefit levels, the authorization for the committee to determine the benefits payable "under the Plan" can only be read as authorization to make the prescribed calculation, not as authorization to award whatever benefits the committee pleases.
 
 
 22
 The local's more substantial claim that the trustees have power to amend the plan comes from the collective bargaining agreement. Article 24, section 5 of the collective bargaining agreement states: "A change of carrier or type of plan shall take place if Trustees so designate with due consideration to membership protection and benefit." (emphasis added). Moreover, Article 24, section 8 provides that if the local were to approve Alternate Article 24 (which it never did), "The Trustees acknowledge that. . . they will cause the necessary action to be taken to increase the plan benefit to twenty-four ($24.00) dollars per month, per year of credited benefit service. . . ."
 
 
 23
 The critical question is whether this language from the collective bargaining agreement conflicts with the provision of the pension plan reserving to Quebecor the power to amend the plan. The language in Article 24, section 8 acknowledging the trustees' duty to amend the plan if Alternate Article 24 were adopted never became effective, because Alternate Article 24 never was adopted. However, the language in Article 24, section 5, giving the trustees power to change the "carrier or type of plan" is at first glance more difficult to reconcile with the plan. The collective bargaining agreement does not define "type of plan," but examination of the sentence in which it occurs and of the contract as a whole convinces us that the phrase refers to the type of insurance contract or other funding vehicle used to fund the plan. In interpreting a collective bargaining agreement, we read the contract as a whole, and we construe individual phrases in their context, not in isolation. See, e.g., Mastro Plastics Corp. v. NLRB, 350 U.S. 270, 281 (1956).
 
 
 24
 Section 5 refers in one breath to change of "carrier or type of plan." The word "carrier" clearly refers to an insurance provider. The introduction to the pension plan explains that the plan was originally funded within a John Hancock annuity contract, but that the plan has been amended and restated in a separate document from the group annuity contract. Further, the annuity contract was changed from a deposit administration contract to a direct rated pension investment contract. The plan defines an annuity contract as "a group annuity or other such contract that may be made between the Trustee and an insurance company in order to fund, in whole or in part, the benefits provided by this Plan." With this background in the plan showing that the type of insurance contract used to fund the plan has been changed in the past, we read the phrase "change of carrier or type of plan" as referring to arrangements between the trustees and an insurance company to fund the benefits provided in the plan. It does not conflict with the pension plan's reservation to Quebecor of the power to amend the plan, and it does not authorize the benefit increase at issue in this case.
 
 
 25
 The local argues that unless we interpret the collective bargaining agreement to permit the trustees to raise benefits, the local members cannot enjoy the surplus in the event that Quebecor's required contribution turns out to be greater than the amount needed to fund the plan at the current benefit levels. Simply put, the employees do not always have an interest in the surplus that builds up in an ERISA plan. See Hughes Aircraft Co. v. Jacobson, 119 S.Ct. 755, 760-61 (1999) (in defined benefit plan, employees had no interest in surplus funds). In this case, we have no authority to change unambiguous language in order to give the local rights that do not exist in the contract and plan. See American Fed'n of Grain Millers, 116 F.3d at 981; Clark v. Kraftco Corp., 510 F.2d 500, 505-06 (2d Cir. 1975).
 
 II.
 
 26
 The local argues that the three earlier instances in which the trustees amended the plan constituted a past practice that has become an implied term of the collective bargaining agreement, citing Keystone Consol. Indus., 309 N.L.R.B. 294 (1992), rev'd on other grounds, 41 F.3d 746 (D.C. Cir. 1994). Only two of the past amendments effected a raise in the defined pension benefit. The other adopted a pre-retirement death benefit. Without deciding whether those few instances could be considered past practices that have "ripened into an established and recognized custom between the parties," Bonnell/Tredegar Indus., Inc. v. NLRB, 46 F.3d 339,344 (4th Cir. 1995) (quotations omitted), we conclude that the meaning of the practice is too uncertain to support a judgment for the local in this case. The three past amendments all occurred between 1990 and 1993, before the current collective bargaining agreement was signed in 1995. Because the local has not provided us with copies of the collective bargaining agreements in effect at the time the trustees voted to amend the benefits, we are unable to determine whether the relevant provisions were the same as under the current contract or whether the current language represents a collectively bargained change in the method of amending the plan. The three sets of minutes the local has provided us are too thin a reed on which to hang an implied term that would change who controls the benefit level.
 
 
 27
 Moreover, allowing the trustees the power to amend the pension plan based on their past amendments would directly contradict the collective bargaining agreement. Article 36 of the collective bargaining agreement, "Past Practices," states:
 
 
 28
 This Contract sets forth the entire understanding and agreement of the parties and may not be modified in any respect except by agreement. Any such amendment will not be final or binding until it is reduced to writing and signed by an authorized representative(s) of the Company and approved and signed by the Union's Executive Board.
 
 
 29
 The integration clause and no-oral-modification clause in the collective bargaining agreement preclude the incorporation into the contract of implied terms that are inconsistent with the contract. See Martinsville Nylon Employees Council Corp. v. NLRB, 969 F.2d 1263, 1268 (D.C. Cir. 1992).
 
 
 30
 Nor can the local rely on the past practices as evidence of the parties' intent in entering the collective bargaining agreement. See id. at 1269. We have concluded that the governing documents in this case are unambiguous; extrinsic evidence cannot be admitted to alter their meaning. See American Fed'n of Grain Millers, 116 F.3d at 981. Therefore, the evidence of past amendments by the trustees cannot create an ambiguity where none exists.
 
 
 31
 Accordingly, we affirm the judgment of the district court.
 
 
 
 Notes:
 
 
 *
 Hon. John R. Gibson, of the United States Court of Appeals for the Eighth Circuit, sitting by designation.