John MARCIC, Plaintiff–Appellant,

v.

REINAUER TRANSPORTATION COMPANIES, Reinauer Transportation Co., L.L.C., Reinauer Maritime Group, Stephen Reinauer, in rem, Austin Reinauer, in rem, and Barge RTC 501, in rem, Defendants–Appellees.

Docket No. 03–9273.

United States Court of Appeals, Second Circuit.

Argued: Aug. 30, 2004.

Decided: Feb. 3, 2005.

Paul Hofmann, Cappiello Hofmann & Katz, P.C. (Michael H. Joseph, on the brief), New York, NY, for Plaintiff–Appellant.

Gino Zonghetti, Kenny, Stearns & Zonghetti, New York, NY, for Defendants–Appellees.

Before: JACOBS and POOLER, Circuit

Judges *.

POOLER, Circuit Judge:

## BACKGROUND

This action concerns a knee injury that plaintiff-appellant Marcic, a seaman, suffered on May 21, 2001, while working for defendants-appellees Reinauer Transportation Companies and associated entities. ("Reinauer"). Marcic alleges that during the night of May 20, 2001, while he was working on the barge RTC 501, owned by Reinauer, he was injured when a fan in the engine room blew a small piece of metal into his eye. The next morning, Marcic, noticing that his eye was inflamed, sought transportation to the shore for medical attention. He boarded the tug boat Stephen Reinauer, also owned by defendants, which reached port facilities in Delaware City, Delaware, and tied up next to the Austin Reinauer, another vessel owned by defendants. The position of the two vessels was such that Marcic was required to cross a small gap between the deck of the Stephen Reinauer and the deck of the Austin Reinauer in order to reach the dock. Marcic claims that he attempted to step from the rail of the Stephen onto the rail of the Austin. As he stepped onto the Austin's rail his foot slipped, and he fell, allegedly injuring his right knee.

Marcic commenced this action in the United States District Court for the Eastern District of New York on May 22, 2002. Alleging that defendants were negligent in failing to paint the rail of the Austin with paint containing a non-skid additive, such as sand or gravel, which would have prevented plaintiff's foot from slipping, Marcic asserted claims for damages under the Jones Act, 46 U.S.C.App. § 688, and general maritime law unseaworthiness principles. Marcic also asserted the right as a seaman under general maritime law to recover "maintenance" during the period of his disability. The parties consented to trial before Magistrate Judge Cheryl L. Pollak.

On August 29, 2003, the jury returned a verdict in favor of defendants on Marcic's unseaworthiness and Jones Act claims and in favor of Marcic on his claim for maintenance, awarding him $75,000. Defendants moved for an order reducing the jury's maintenance award to $13,695, calculated at the rate of fifteen dollars per day, which defendants contend was required by the Collective Bargaining Agreement ("CBA") between plaintiff's union and Reinauer. Marcic disputes defendants' interpretation of the CBA, asserting that it sets fifteen dollars as the minimum daily maintenance amount but sets no maximum. The district court granted defendants' motion by order of October 30, 2003, holding that *Ammar v. United States*, 342 F.3d 133 (2d Cir.2003), decided the same day as the jury's verdict, required the court to defer to the maintenance amount set by the CBA, and entering an order reducing the jury's maintenance award to $13,695.

Marcic timely appealed, claiming entitlement to a new trial on his unseaworthiness and Jones Act claims. Marcic also seeks restoration of the jury's $75,000 maintenance award, asserting that the district court's interpretation of the CBA was erroneous. We reject Marcic's claim for a new trial, but agree that the district court's interpretation of the CBA was erroneous.

---

* The Honorable Ellsworth Van Graafeiland, who was a member of this panel and voted with the majority, passed away following argument in this case. This appeal is being decided by the remaining two members of the panel, who are in agreement. *See* Local Rule § 0.14(b).

## DISCUSSION

We review a district court's evidentiary rulings for abuse of discretion, and will reverse only if an erroneous ruling affected a party's substantial rights. *See Ramey v. District 141, Int'l Ass'n of Machinists*, 378 F.3d 269, 281 (2d Cir.2004). We review a district court's interpretation of a CBA de novo. *See Adirondack Transit Lines, Inc. v. United Transp. Union, Local 1582*, 305 F.3d 82, 85 (2d Cir.2002). The standard that we apply in reviewing a party's claim that errors of the district court entitle her to a new trial depends on whether that party objected contemporaneously to the purported errors. A party is generally entitled to a new trial if the district court committed errors that were a "clear abuse of discretion" that were "clearly prejudicial to the outcome of the trial." *Pescatore v. Pan Am. World Airways, Inc.*, 97 F.3d 1, 17 (2d Cir.1996). "Prejudice is measured by assessing the error in light of the record as a whole." *Id.* Where claimed error was not objected to contemporaneously, appellant faces an even heavier burden. Because the failure to object deprives the trial court of the opportunity to correct the error during trial, we will examine it on appeal only for "plain error." *See Greenway v. Buffalo Hilton Hotel*, 143 F.3d 47, 51 (2d Cir.1998); *Pescatore*, 97 F.3d at 18. In the case of unpreserved error, a new trial will be granted only for error that was "so serious and flagrant that it goes to the very integrity of the trial." *Greenway*, 143 F.3d at 51 (quoting *Pescatore*, 97 F.3d at 18).

## I. Marcic's Claimed Entitlement to a New Trial

Marcic claims entitlement to a new trial on two grounds. First, Marcic alleges that Reinauer's counsel made numerous improper and prejudicial comments to the jury at trial. Second, Marcic challenges the court's exclusion on hearsay grounds of testimony he proffered as to a deck hand's alleged admission, immediately after the fall, that the Austin's rail had been painted with paint not containing a non-skid additive.

### A. Counsel's Allegedly Improper Comments to the Jury

Marcic contends that he is entitled to a new trial because "[d]efense counsel's repeated appeals to prejudice through accusations of [plaintiff's] litigiousness, misstatements of evidence, screaming at witnesses, expression of personal opinions as to witnesses' credibility and the merits of plaintiff's case, were blatantly improper and the trial's fairness and integrity were compromised." Appellant's Br. at 21. As noted above, we review this claim for abuse of discretion where Marcic objected contemporaneously to the district court's purported errors, and for plain error where he did not. In either case a party seeking a new trial on the basis of opposing counsel's improper statements to the jury faces a heavy burden, as "[r]arely will an attorney's conduct so infect a trial with undue prejudice or passion as to require reversal." *Reilly v. Natwest Markets Group, Inc.*, 181 F.3d 253, 271 (2d Cir.1999) (internal quotation marks omitted). In particular, where the jury's verdict finds substantial support in the evidence, counsel's improper statements will frequently be *de minimis* in the context of the entire trial. *See Pappas v. Middle Earth Condo. Ass'n*, 963 F.2d 534, 540 (2d Cir.1992). Here, the jury's verdict was supported by evidence that the rail of the Austin had, in fact, been painted with non-skid paint.

Marcic recites an extensive litany of alleged improprieties on the part of Reinauer's counsel. He relies principally on three categories of allegedly improper

statements: assertions allegedly suggesting that plaintiff was litigious; alleged misstatements of the evidence; and statements expressing counsel's personal opinion or tending to inflame or impassion the jury.

### 1. Comments Allegedly Suggesting Plaintiff Was Litigious

Marcic complains that three series of questions by Reinauer's counsel while cross-examining Marcic improperly prejudiced him by suggesting to the jury that he was litigious. First, counsel asked a series of questions suggesting that Marcic chose to seek medical care through his employer rather than his health insurance provider in order to bolster his lawsuit by documenting the job-related character of his injury. Second, counsel asked a series of questions suggesting that Marcic filled out the personal logs that he kept as part of his job duties in a manner calculated to bolster his lawsuit. Last, counsel asked a series of questions of Marcic eliciting information regarding a previous job injury over which counsel suggested Marcic had previously consulted a lawyer and considered suing Reinauer. Marcic objected to each of these exchanges. Marcic also complains about counsel's references to questions and answers during his closing.

■ A trial court has a duty to prevent charges of litigiousness if they are likely to result in undue prejudice that is not substantially outweighed by their probative value. Here, Reinauer's counsel repeatedly suggested that the instant case was fraudulent and brought for a financial motive,[1] and inquired into plaintiff's previous injury and into whether plaintiff previously contemplated a lawsuit; but counsel at no time expressly charged Marcic with being litigious or bringing previous lawsuits. *Compare Outley*, 837 F.2d at 592 n. 2 (noting that counsel characterized plaintiff as "perpetual litigant" and emphasized in closing that he was "no stranger to litigation"). Questions about Marcic's decision not to utilize his health insurance, or about his manner of filling out his personal log book, raise no implication that plaintiff was litigious. Instead, the implication was that plaintiff had a financial motive to lie about his accident. A claim for money damages does create a financial incentive to be untruthful, and it was not improper for opposing counsel to invoke this incentive in an attempt to impeach plaintiff. With regard to questions about Marcic's previous injury and consultation with a lawyer, there were only a handful of questions suggesting a single previous consultation with a lawyer, in the course of a week-long trial and taking up only a few pages in the over 1200–page trial transcript. In the context of the entire trial, and given the evidentiary support for the jury's verdict, the probative value of these questions, even if improper, was not so outweighed by any potential prejudice as to entitle Marcic to a new trial. *See Pescatore*, 97 F.3d at 17 (holding district court abused its discretion by referring twice itself and allowing plaintiff to refer several times to defendant's "wilful misconduct," but holding statements, made during two-week jury trial, insufficiently prejudicial to require new trial).

### 2. Alleged Misrepresentations of the Evidence

Marcic complains of numerous instances of what he characterizes as misstatements

---

1. Motive or plan may be appropriate grounds for allowing charges that a party is litigious. *See* Fed.R.Evid. 404(b). Had the instant case been part of a fraudulent scheme, for example, such charges of litigousness would have been wholly appropriate. *See Gastineau v. Fleet Mortgage Corp.*, 137 F.3d 490, 496 (7th Cir.1998); *Outley v. City of New York*, 837 F.2d 587, 594 (2d Cir.1988).

of the evidence by Reinauer's counsel. Almost all of these were made during Reinauer's summation, and Marcic objected only once during summation. Therefore, all but one of these claims of error are reviewed only for "plain error." Furthermore, almost all of the statements Marcic relies on were statements suggesting that Marcic or his witnesses lied or that their testimony was unbelievable. Such statements were not statements of the evidence at all, but were rather argument calling on the jury to draw inferences from the evidence. "A district court is entitled to give attorneys wide latitude in formulating their arguments." *Reilly*, 181 F.3d at 271. It was certainly not "plain error" to allow counsel to present these arguments to the jury.

■ Marcic's sole objection during closing was to Reinauer's suggestion that Marcic may have actually fallen after slipping on the deck, not the rail, of the Austin. Again, this statement was not improper; as the district court noted in overruling Marcic's objection, it was merely a suggestion of an "inference[ ] that the jury can conclude from the evidence"-particularly, it explained and reconciled evidence suggesting both that Marcic fell and that the rail was painted with non-skid paint.

Marcic complains also of one question during Reinauer's cross-examination of plaintiff's vocational expert. Reinauer's counsel asked whether the witness had seen a document signed by Dr. Leon Finkelstein on September 11, 2002, "releasing Mr. Marcic to full duty effective December 16, 02." Marcic argues that this misstated the evidence because Dr. Finkelstein had previously testified during redirect examination that he thought he had only found plaintiff fit to work at a gas station, not on a boat. However, during cross-examination by Reinauer, Dr. Finkelstein had agreed that "there [were] no restrictions placed on his ability to return to work." The document signed by Dr. Finkelstein itself states that "John Marcic ... is able to return to work as of 9/16/02." In light of the record, Reinauer's counsel did not misstate the evidence.

■ Marcic finally complains that during summation, Reinauer's counsel, after stating that Marcic had chosen not to seek a boat steering job, added, "I submit to you [it] is not a[ ] strenuous job." Marcic argues that this statement was improper because "[t]here was no testimony concerning the job requirements of" the steering job. Appellant's Br. at 11. Marcic failed to object to counsel's statement, and we are not persuaded that this single statement, even if improper, made during Reinauer's summation, which spans thirty-seven pages of the trial transcript, caused such prejudice as to affect the integrity of the trial.

### 3. Counsel's Expression of Personal Opinion and Inflammatory Commentary

Marcic complains of numerous instances in which he alleges that Reinauer's counsel improperly expressed his personal opinion. Some of these are instances in which counsel merely suggested that witnesses were lying or had a motive to lie, or argued in favor of certain inferences from the evidence. Marcic does, however, point to certain rather inflammatory statements, some of which were framed as personal opinion. For example, at one point during summation counsel stated that "this case, I think the overall view of it, from my p[er]spective, in my humble judgment, is that this case is nothing short of unseemly-I think this case represents an example of what a group of people with absolutely no regard for the truth or the sanctity of the court system or the imposition that they had imposed on people like yourself can do

when money is at stake.... [T]his case is just a disgusting affront to what should occur in a courthouse." Later, counsel stated that he had listened to the testimony of Marcic's medical expert in a state of disbelief that someone would tell such outrageous lies under oath. Counsel also stated that the testimony of Marcic's medical expert was "as silly a thing as I have seen in a case, I can't imagine anything sillier," and stated that he thought it was "sad" that Marcic would waste the time and money of the court and jurors on his case. In addition to these few specific instances of improper statements of opinion, Marcic suggests that by arguing that practically every single statement by every single one of his witnesses was a lie, by commenting repeatedly on the ease with which Marcic's witnesses lied and the low regard in which they appeared to hold the truth, and by characterizing Marcic's case as "frivolous," and "a joke," Reinauer's counsel crossed the line between permissible fair comment on the evidence and improperly prejudicial and inflammatory commentary. Marcic has a point-these statements by Reinauer's counsel were certainly "hardly commendable." *Greenway*, 143 F.3d at 51.

▮ However, these statements were not so inflammatory or so unsupported by the record as to affect the integrity of the trial and entitle Marcic to a new trial. In the case principally relied on by Marcic, *Koufakis v. Carvel*, 425 F.2d 892 (2d Cir. 1970), this Court ordered a new trial where counsel repeatedly used "slanderous and baseless epithets," *see* 425 F.2d at 901–03 (recounting counsel's numerous references to the Mafia, reference to defendant as "top leader of the Mafia in a business way," characterization of case as pitting unscrupulous rich against deserving poor, and references to defendant as "liar," "faker," "phony," and "perjurious"), and

engaged in personal attacks on opposing counsel during summation, *see* 425 F.2d at 904 & n. 16 (recounting counsel's comparison of opposing counsel to Goebbels, and suggestion that opposing counsel thought jurors were "stupid"). *See also Fineman v. Armstrong World Indus., Inc.*, 980 F.2d 171, 206–07 (3d Cir.1992) (affirming district court's order granting defendants a new trial where plaintiffs' counsel characterized defendants' witnesses as "liars" and "perjurers," repeatedly relied on facts not in evidence, and engaged in repeated personal attacks on opposing counsel during summation).

The comments by Reinauer's counsel do not rise to the level of what has been held to be so prejudicial as to require a new trial. "Not every improper or poorly supported remark made in summation irreparably taints the proceedings; only if counsel's conduct created undue prejudice or passion which played upon the sympathy of the jury, should a new trial be granted." *Matthews v. CTI Container Transport Int'l, Inc.*, 871 F.2d 270, 278 (2d Cir.1989). While counsel certainly suggested that Marcic and his witnesses were willing to lie to make money, counsel did not engage in personal attacks on opposing counsel, nor did he utilize epithets or slurs, or appeal to the jury's regional, economic, or other prejudices. *See Pappas*, 963 F.2d at 539, 541 (ordering new trial on basis of counsel's repeated references, despite numerous sustained objections, to fact that defendant was from out of state); *Koufakis*, 425 F.2d at 902 (relying in part on counsel's characterization of case as "one which pitted a 'little' and virtuous man of modest resources against a powerful and unscrupulous man with untold wealth"). To the extent that Reinauer's counsel's statements were improper, they were not objected to, and occurred in the context of a summation spanning thirty-seven pages of trial transcript, at the end of a week-

long trial in which voluminous evidence was introduced that sufficed to support the jury's verdict. *See Pappas,* 963 F.2d at 539 (finding improper comments prejudicial in light of thin evidentiary support for jury's verdict).

## B. Allegedly Improper Exclusion of Evidence

Marcic argues that he is entitled to a new trial due to the allegedly erroneous exclusion on hearsay grounds of testimony he proffered as to a deck hand's alleged admission, immediately after Marcic's fall, that the rail of the Austin had been painted without a non-skid additive. At trial, Marcic testified that shortly after his fall he saw "two individuals [who] were crew members of the Austin" and "said to both of them hey, guys, there was no sand in that rail, in that paint." Marcic then testified that one of the individuals responded, at which point defendants' counsel objected, and Marcic's counsel stated that he offered the individual's response "as an admission." In response to a question from the court, Marcic testified that he did not know the name of the person who responded, but that both individuals he addressed were members of the Austin's crew. The Judge then called a sidebar conference, during which the following colloquy ensued:

> MR. ZONGHETTI: I mean how is a statement by a deck hand an admission, number one?
>
> MR. JOSEPH: Judge, he is a member of the crew. He worked as an employee of the defendants. He is their agent. He made a statement in the course of his duties . . . .
>
> MR. ZONGHETTI: He is not their agent. He is a deckhand. He is a line level employee. You can't bind us to anything. That is not an admission.

> THE COURT: It is usually a corporate office[r] who is an agent.
>
> MR. JOSEPH: Those are probably the guys who painted the rail.
>
> MR. ZONGHETTI: It doesn't matter.
>
> [THE COURT:] If you want to call them and have them testify, I will allow you to do that.
>
> . . . .
>
> THE COURT: I want to do a little checking into this. I would like to see some research that shows we have a deckhand. I am used to dealing with corporation[s].
>
> I don't think that low level employees of the corporation can make a statement that binds the corporation. If you have some basis for asserting case law authority that indicates that a deckhand, which is the lowest on the totem pole of the ship owner here, he can bind the company somehow through a statement, I will let your client retake the stand and testify about that.
>
> I think I am going to sustain the objection at this point . . . .

While the identity of the two deck hands was known to both parties, and the deck hands were available to testify, neither party called either deck hand as a witness. Plaintiff's counsel did not at any point come forward with the research invited by the district court to support his argument that the statement should be admissible as an admission.

■ Rule 801(d)(2)(D) of the Federal Rules of Evidence defines as nonhearsay a statement offered against a party that is "a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship." In order to introduce evidence of an out-of-court statement as nonhearsay under Rule 801(d)(2)(D), a party must lay a sufficient

foundation by establishing "(1) the existence of the agency relationship, (2) that the statement was made during the course of the relationship, and (3) that it relates to a matter within the scope of the agency." *Pappas*, 963 F.2d at 537.

 Marcic failed to lay a sufficient foundation to support admission of the deck hand's alleged statement. While Marcic speculated that the deck hand was probably one of the persons who painted the rail, so that his statement that it had not been painted with non-skid paint would "relate to a matter" within the scope of his agency relationship with Reinauer, Marcic did not offer any evidence that this was the case, despite the availability of the two deck hands as witnesses and the court's willingness to allow them to testify. The exclusion of this evidence was not error.

## II. Reduction of Plaintiff's Maintenance Award

Marcic appeals the district court's order granting Reinauer's motion to reduce the jury's maintenance verdict from $75,000 to $13,695. The parties' dispute regards the proper interpretation of Section 16 of the Collective Bargaining Agreement in effect at the time of the accident between Marcic's union, Local 333 of the United Marine Division, International Longshoreman's Association, AFL–CIO, and Reinauer. This section reads as follows:

**Section 16. Maintenance and cure.**

When an Employee becomes ill or is injured under circumstances entitling him to maintenance and cure under general maritime law principles, he shall be paid a minimum of $15.00 per day for each day or part thereof of entitlement. If the Employer contests its liability for maintenance and cure in any case, the issue shall not be determined under this Agreement but solely by a court of competent jurisdiction, except that such

claims for maintenance and cure of less than $200.00 for any single accident or sickness shall be determined under the Adjustment and Arbitration provisions of this Agreement. Such claims shall be determined on their respective merits even though they do not involve the interpretation or application of this Agreement.

In adjusting maintenance and cure for legitimate out-patient treatment, the Employer will compensate the Employee on the basis of $15.00 per day subject to the production of a "Non fit for duty certificate."

Reinauer argues that the latter paragraph clearly establishes the fifteen dollar per day rate as the maximum amount available in response to a claim for maintenance. Marcic argues that the plain text of the section establishes a "minimum" rate and nowhere uses the word "maximum," and that the latter paragraph may be interpreted consistently with the first as establishing an automatic entitlement to maintenance at a rate of fifteen dollars per day on production of a "Non fit for duty certificate," which would not preclude claiming maintenance at a higher rate that would not be automatic. The district court, finding that district courts in this Circuit were divided on the application of CBA provisions setting "minimum" rates of maintenance, held that this Court's decision in *Ammar* tipped the balance in favor of those interpreting them as setting fixed rates. *See Marcic v. Reinauer Transp. Cos.*, 2003 WL 23185671, at *4 (E.D.N.Y. Oct.30, 2003).

 Under the general maritime law of the United States, "maintenance" refers to the obligation of a shipowner to provide food and lodging, comparable to that received aboard a vessel, to a seaman

who falls ill or becomes injured while in the service of that vessel. *See generally, e.g., Vella v. Ford Motor Co.,* 421 U.S. 1, 3, 95 S.Ct. 1381, 43 L.Ed.2d 682 (1975); *Calmar S.S. Corp. v. Taylor,* 303 U.S. 525, 527, 58 S.Ct. 651, 82 L.Ed. 993 (1938); *The Osceola,* 189 U.S. 158, 175, 23 S.Ct. 483, 47 L.Ed. 760 (1903); *Ammar,* 342 F.3d at 142; 1 Thomas J. Schoenbaum, *Admiralty and Maritime Law* § 6–28 (4th ed.2004) (hereinafter Schoenbaum, *Admiralty & Mar. Law* ). It is "a right as old as maritime law itself and has been recognized for centuries by most all seafaring nations." John B. Shields, *Seamen's Rights to Recover Maintenance and Cure Benefits,* 55 Tul. L.Rev. 1046, 1046 (1981). The right to maintenance does not depend on the shipowner's fault or the job-relatedness of the seaman's injury. *See, e.g., Vella,* 421 U.S. at 4, 95 S.Ct. 1381; *Ammar,* 342 F.3d at 142. The shipowner's obligation to pay maintenance lasts until the seaman has recovered or his condition is declared permanent and incurable. *See, e.g., Vella,* 421 U.S. at 5, 95 S.Ct. 1381; *Ammar,* 342 F.3d at 142.

The right to maintenance arises out of the contractual employment relationship. However, it is a right imposed by the general maritime law itself and "differs from rights normally classified as contractual" in that it is nonwaivable. *Vaughan v. Atkinson,* 369 U.S. 527, 532, 82 S.Ct. 997, 8 L.Ed.2d 88 (1962), *quoted by Ammar,* 342 F.3d at 142. The reasons underlying the general maritime law's imposition of the maintenance obligation were first enumerated by Justice Joseph Story in 1823. *Harden v. Gordon,* 11 F. Cas. 480 (C.C.D.Me.1823) (No. 6047) (Story, J.), *discussed in Calmar,* 303 U.S. at 528, 58 S.Ct. 651. They include "the protection of seamen, who, as a class, are poor, friendless and improvident, from the hazards of ill-ness and abandonment while ill in foreign ports; the inducement to masters and owners to protect the safety and health of seamen while in service; the maintenance of a merchant marine for the commercial service and maritime defense of the nation by inducing men to accept employment in an arduous and perilous service." *Id.,* citing *Harden,* 11 F. Cas. at 480.

Historically, the amount of a seaman's maintenance award has been determined by the court based upon a factual determination of the seaman's actual expenditures for food and lodging. *See Ammar,* 342 F.3d at 143. Between the 1940s and 1970s courts tended to apply a standardized rate of eight dollars per day. *See Ammar,* 342 F.3d at 143; *Harper v. Zapata Off–Shore Co.,* 741 F.2d 87, 91 (5th Cir.1984). Beginning in the 1980s courts relied on evidence of expenses submitted by the seaman and rebuttal evidence by the shipowner in computing maintenance. *See Harper,* 741 F.2d at 91; *Incandela v. American Dredging Co.,* 659 F.2d 11, 14 (2d Cir.1981) ("[A] seaman makes out a prima facie case on the maintenance rate question when he proves the actual living expenditures which he found it necessary to incur during his convalescence."); 1 Schoenbaum, *Admiralty & Mar. Law* § 6–32 ("Now, however, the courts permit the seaman to submit evidence of his actual expenditures, and this as well as rebuttal evidence will have determinative weight.").

Since the late 1950s, CBAs between ship owners and seamens' unions have often defined fixed rates of maintenance. Until the late 1980s the typical rate was eight dollars per day, but higher rates have since become more common. *See Ammar,* 342 F.3d at 143. In disputes over maintenance obligations, ship owners governed by such contracts have argued that courts

should respect the fixed rates set by the CBAs. The Circuit Courts have divided over whether to accept this argument, or to continue the traditional judicial practice of setting maintenance rates based on the seaman's proven expenses notwithstanding any purported contractual limitation on the right. *See id.* This Court in *Ammar* joined the majority of Circuit Courts to have considered the matter in holding that while the right to maintenance may not be waived by contract, seamen may, through union-negotiated CBAs, limit the rate of maintenance to which they are entitled, and courts must respect such limitations. *See id.* at 146. Noting that having formed large and powerful unions to represent their interests, seamen are no longer as "friendless" as they may have been when Justice Story wrote in 1823, we explained that "the need for judicial intervention to protect seamen has been substantially lessened" due to seamen's own ability to protect their interests by pooling their strength and bargaining collectively. *Id.* Our national labor policy therefore demands that courts enforce the actual terms of the bargain negotiated between seamen and their employers, so long as the CBA was legitimately negotiated and the seaman's interests were adequately represented. *See id.* To refuse to enforce CBA-imposed limits on maintenance rates out of a misplaced solicitousness to seamen may actually have the perverse effect of weakening their position vis-a-vis their employers by impeding their effective collective bargaining. Seamen must be allowed to carry maintenance rates to the table in negotiations with employers as one bargaining chip among many in seeking an optimal package of employment terms and benefits.

Courts must therefore be careful to determine what were the actual terms agreed to by the parties to a CBA, and not impose a limitation on the rate of maintenance where none was intended or agreed to. *Ammar* assumes that seamen may in certain instances desire to trade a concession on the rate of maintenance for concessions by the employer on other issues, but seamen may conversely choose to negotiate for a more flexible rate of maintenance. To refuse to enforce flexible rates of maintenance would impede the parties' effective bargaining no less than a refusal to enforce fixed rates. Traditional principles of construction of CBAs continue to guide our determination of which type of rate the parties intended. *See, e.g., Mastro Plastics Corp. v. NLRB,* 350 U.S. 270, 279, 76 S.Ct. 349, 100 L.Ed. 309 (1956) ("Like other contracts, [a CBA] must be read as a whole and in the light of the law relating to it when made."); *Aeronautical Indus. Dist. Lodge 91 v. United Techs. Corp.,* 230 F.3d 569, 576 (2d Cir.2000) ("When courts interpret CBAs, traditional rules of contract interpretation apply as long as they are consistent with federal labor policies."); *Bozetarnik v. Mahland,* 195 F.3d 77, 82 (2d Cir.1999) ("In interpreting a [CBA], we read the contract as a whole, and we construe individual phrases in their context, not in isolation."); *Smith v. ABS Indus., Inc.,* 890 F.2d 841, 845–46 (6th Cir.1989) (listing principles of contract interpretation applicable to CBAs).

■ Here, we are faced with a CBA provision containing two paragraphs that appear inconsistent: the first states the rate as "a *minimum* of $15.00 per day," while the second mandates compensation "on the basis of $15.00 per day subject to the production of a 'Non fit for duty certificate.'" (emphasis added). In resolving such ambiguity, we may look to such evidence as bargaining history, past practices,

or other CBA provisions; we must also seek to avoid rendering any of the CBA language superfluous. *See Aeronautical Indus. Dist. Lodge 91*, 230 F.3d at 576. We may also look to the legal context in which the language was written in attempting to determine its drafters' intent. *See Mastro*, 350 U.S. at 279, 76 S.Ct. 349. Neither party has provided evidence of the bargaining history or past practices of the parties or the general practice of the industry with regard to CBA provisions governing maintenance. We do note, however, that the CBA language interpreted in this Court's other cases supports the contention that alternative language was available to the parties that would have made the fixity of the maintenance rate specified in the CBA unambiguous. *See, e.g., Ammar*, 342 F.3d at 138 (quoting CBA language providing that "[w]hen a member ... is entitled to Maintenance and Cure under Maritime Law, he shall be paid maintenance at the rate of eight dollars ... per day for each day or part thereof of entitlement"). As noted by the district court, the legal background at the time of negotiation of the instant CBA was one in which provisions setting a "minimum" rate of maintenance had been interpreted by some courts as providing for a flexible rate. *Marcic*, 2003 WL 23185671, at *4. Furthermore, *Ammar* not yet having declared it improper, district courts were wont to award maintenance based on a flexible rate even in the face of a CBA provision unambiguously setting a fixed rate. *See Ammar*, 342 F.3d at 138. Indeed, the district court in *Ammar* did precisely this. *Id.* 138–39. Had the parties, acting against this legal background, truly intended a fixed rate of maintenance, one would expect them to have made this intention clear, in light of the case law favoring flexibility. That they instead adopted ambiguous language that easily lends itself to a flexible-rate interpretation strongly suggests that they did not intend a fixed rate. Furthermore, other language in the CBA makes it clear that the drafters themselves were capable of expressing unambiguously inflexible compensation rates: Section 13 of the CBA, providing "Compensation for Loss of Effects," provides that an employee "shall be paid by the Employer the sum of Four Hundred Fifty Dollars ... in full compensation for" any total loss of effects due to fire or sinking, "whether or not the loss is greater or less than Four Hundred Fifty Dollars." That the drafters included ambiguous language in Section 13 when unambiguous language was available further counsels against an interpretation of the rate as inflexible.

The most serious flaw with the district court's interpretation, however, is that it renders the word "minimum" in the CBA provision entirely superfluous and nugatory, when an interpretation is available that gives effect to all of the provision's language. We therefore hold that the interpretation suggested by Marcic is the correct one: the fifteen dollar rate is, as its plain language states, a minimum which the jury was free to exceed based on facts proved by Marcic. The payments triggered by production of a "Non fit for duty certificate" were not maximum payments but rather automatic payments to which a claimant was entitled without having to prove actual expenses. The district court's interpretation was thus erroneous, and we vacate and remand for restoration of the jury's $75,000 maintenance award.

## CONCLUSION

For the foregoing reasons, we affirm the jury's finding for defendants as to Marcic's unseaworthiness and Jones Act claims, and

vacate and remand for reentry of the jury's $75,000 maintenance award.